# GRUTTER *v.* BOLLINGER ET AL.

No. 02–241.   Argued April 1, 2003—Decided June 23, 2003

O'CONNOR, J., delivered the opinion of the Court, in which STEVENS, SOUTER, GINSBURG, and BREYER, JJ., joined, and in which SCALIA and THOMAS, JJ., joined in part insofar as it is consistent with the views expressed in Part VII of the opinion of THOMAS, J. GINSBURG, J., filed a concurring opinion, in which BREYER, J., joined, *post*, p. 344. SCALIA, J., filed an opinion concurring in part and dissenting in part, in which THOMAS, J., joined, *post*, p. 346. THOMAS, J., filed an opinion concurring in part and dissenting in part, in which SCALIA, J., joined as to Parts I–VII, *post*, p. 349. REHNQUIST, C. J., filed a dissenting opinion, in which SCALIA, KENNEDY, and THOMAS, JJ., joined, *post*, p. 378. KENNEDY, J., filed a dissenting opinion, *post*, p. 387.

*Kirk O. Kolbo* argued the cause for petitioner. With him on the briefs were *David F. Herr, R. Lawrence Purdy, Michael C. McCarthy, Michael E. Rosman, Hans Bader,* and *Kerry L. Morgan.*

*Solicitor General Olson* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Assistant Attorney General Boyd* and *Deputy Solicitor General Clement.*

*Maureen E. Mahoney* argued the cause for respondent Bollinger et al. With her on the brief were *John H. Pickering, John Payton, Brigida Benitez, Craig Goldblatt, Terry A. Maroney, Marvin Krislov, Jonathan Alger, Evan Caminker, Philip J. Kessler,* and *Leonard M. Niehoff.*

*Miranda K. S. Massie* and *George B. Washington* filed a brief for respondent James et al.*

---

*Briefs of *amici curiae* urging reversal were filed for the State of Florida et al. by *Charlie Crist,* Attorney General of Florida, *Christopher M. Kise,* Solicitor General, *Louis F. Hubener,* Deputy Solicitor General, and

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to decide whether the use of race as a factor in student admissions by the University of Michigan Law School (Law School) is unlawful.

*Daniel Woodring;* for the Cato Institute by *Robert A. Levy, Timothy Lynch, James L. Swanson,* and *Samuel Estreicher;* for the Center for Equal Opportunity et al. by *Roger Clegg* and *C. Mark Pickrell;* for the Center for Individual Freedom by *Renee L. Giachino;* for the Center for New Black Leadership by *Clint Bolick, William H. Mellor,* and *Richard D. Komer;* for the Center for the Advancement of Capitalism by *David Reed Burton;* for the Claremont Institute Center for Constitutional Jurisprudence by *Edwin Meese III;* for the Michigan Association of Scholars by *William F. Mohrman;* for the National Association of Scholars by *William H. Allen, Oscar M. Garibaldi,* and *Keith A. Noreika;* for the Pacific Legal Foundation by *John H. Findley;* for Law Professor Larry Alexander et al. by *Erik S. Jaffe;* and for the Reason Foundation by *Martin S. Kaufman.*

Briefs of *amici curiae* urging affirmance were filed for the State of Maryland et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Andrew H. Baida,* Solicitor General, *Mark J. Davis* and *William F. Brockman,* Assistant Attorneys General, *Eliot Spitzer,* Attorney General of New York, *Caitlin J. Halligan,* Solicitor General, *Michelle Aronowitz,* Deputy Solicitor General, and *Julie Mathy Sheridan* and *Sachin S. Pandya,* Assistant Solicitors General, and by the Attorneys General for their respective jurisdictions as follows: *Terry Goddard* of Arizona, *Bill Lockyer* of California, *Ken Salazar* of Colorado, *Richard Blumenthal* of Connecticut, *Lisa Madigan* of Illinois, *Thomas J. Miller* of Iowa, *G. Steven Rowe* of Maine, *Thomas F. Reilly* of Massachusetts, *Mike Hatch* of Minnesota, *Mike McGrath* of Montana, *Patricia A. Madrid* of New Mexico, *Roy Cooper* of North Carolina, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *Patrick Lynch* of Rhode Island, *William H. Sorrell* of Vermont, *Iver A. Stridiron* of the Virgin Islands, *Christine O. Gregoire* of Washington, *Darrell V. McGraw, Jr.,* of West Virginia, and *Peggy A. Lautenschlager* of Wisconsin; for the State of New Jersey by *David Samson,* Attorney General, *Jeffrey Burstein,* Assistant Attorney General, and *Donna Arons* and *Anne Marie Kelly,* Deputy Attorneys General; for New York City Council Speaker A. Gifford Miller et al. by *Jack Greenberg* and *Saul B. Shapiro;* for the City of Philadelphia, Pennsylvania, et al. by *Victor A. Bolden* and *Nelson A. Diaz;* for the American Bar Association by *Paul M. Dodyk* and *Rowan D. Wilson;* for the American Educational Re-

## I

## A

· The Law School ranks among the Nation's top law schools. It receives more than 3,500 applications each year for a class

search Association et al. by *Angelo N. Ancheta;* for the American Jewish Committee et al. by *Stewart D. Aaron, Thomas M. Jancik, Jeffrey P. Sinensky, Kara H. Stein,* and *Richard T. Foltin;* for the American Law Deans Association by *Samuel Issacharoff;* for the American Psychological Association by *Paul R. Friedman,William F. Sheehan,* and *Nathalie F. P. Gilfoyle;* for the American Sociological Association et al. by *Bill Lann Lee* and *Deborah J. Merritt;* for Amherst College et al. by *Charles S. Sims;* for the Arizona State University College of Law by *Ralph S. Spritzer* and *Paul Bender;* for the Association of American Law Schools by *Pamela S. Karlan;* for the Association of American Medical Colleges et al. by *Robert A. Burgoyne* and *Joseph A. Keyes, Jr.;* for the Bay Mills Indian Community et al. by *Vanya S. Hogen;* for the Clinical Legal Education Association by *Timothy A. Nelsen, Frances P. Kao,* and *Eric J. Gorman;* for Columbia University et al. by *Floyd Abrams* and *Susan Buckley;* for the Graduate Management Admission Council et al. by *Stephen M. McNabb;* for the Harvard Black Law Students Association et al. by *George W. Jones, Jr., William J. Jefferson, Theodore V. Wells, Jr.,* and *David W. Brown;* for Harvard University et al. by *Laurence H. Tribe, Jonathan S. Massey, Beverly Ledbetter, Robert B. Donin,* and *Wendy S. White;* for the Hispanic National Bar Association et al. by *Gilbert Paul Carrasco;* for Howard University by *Janell M. Byrd;* for Indiana University by *James Fitzpatrick, Lauren K. Robel,* and *Jeffrey Evans Stake;* for the King County Bar Association by *John Warner Widell, John H. Chun,* and *Melissa O'Loughlin White;* for the Law School Admission Council by *Walter Dellinger, Pamela Harris,* and *Jonathan D. Hacker;* for the Lawyers' Committee for Civil Rights Under Law et al. by *John S. Skilton, David E. Jones, Barbara R. Arnwine, Thomas J. Henderson, Dennis C. Hayes, Marcia D. Greenberger,* and *Judith L. Lichtman;* for the Leadership Conference on Civil Rights et al. by *Robert N. Weiner* and *William L. Taylor;* for the Mexican American Legal Defense and Educational Fund et al. by *Antonia Hernandez;* for the Michigan Black Law Alumni Society by *Christopher J. Wright, Timothy J. Simeone,* and *Kathleen McCree Lewis;* for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Theodore M. Shaw, Norman J. Chachkin, Robert H. Stroup, Elise C. Boddie,* and *Christopher A. Hansen;* for the National Center for Fair & Open Testing by *John T. Affeldt* and *Mark Savage;* for the National Coalition of Blacks for Reparations in America et al. by *Kevin Outterson;* for the National Education

of around 350 students. Seeking to "admit a group of students who individually and collectively are among the most capable," the Law School looks for individuals with "sub-

Association et al. by *Robert H. Chanin, John M. West, Elliot Mincberg, Larry P. Weinberg,* and *John C. Dempsey;* for the National Urban League et al. by *William A. Norris* and *Michael C. Small;* for the New America Alliance by *Thomas R. Julin* and *D. Patricia Wallace;* for the New Mexico Hispanic Bar Association et al. by *Edward Benavidez;* for the NOW Legal Defense and Educational Fund et al. by *Wendy R. Weiser* and *Martha F. Davis;* for the School of Law of the University of North Carolina by *John Charles Boger, Julius L. Chambers,* and *Charles E. Daye;* for the Society of American Law Teachers by *Michael Selmi* and *Gabriel J. Chin;* for the UCLA School of Law Students of Color by *Sonia Mercado;* for the United Negro College Fund et al. by *Drew S. Days III* and *Beth S. Brinkmann;* for the University of Michigan Asian Pacific American Law Students Association et al. by *Jerome S. Hirsch;* for the University of Pittsburgh et al. by *David C. Frederick* and *Sean A. Lev;* for Judith Areen et al. by *Neal Katyal* and *Kumiki Gibson;* for Lieutenant General Julius W. Becton, Jr., et al. by *Virginia A. Seitz, Joseph R. Reeder, Robert P. Charrow,* and *Kevin E. Stern;* for Hillary Browne et al. by *Gregory Alan Berry;* for Senator Thomas A. Daschle et al. by *David T. Goldberg* and *Penny Shane;* for the Hayden Family by *Roy C. Howell;* for Glenn C. Loury by *Jeffrey F. Liss* and *James J. Halpert;* and for 13,922 Current Law Students at Accredited American Law Schools by *Julie R. O'Sullivan* and *Peter J. Rubin.*

Briefs of *amici curiae* were filed for Michigan Governor Jennifer M. Granholm by *John D. Pirich* and *Mark A. Goldsmith;* for Members and Former Members of the Pennsylvania General Assembly et al. by *Mark B. Cohen* and *Eric S. Fillman;* for the American Council on Education et al. by *Martin Michaelson, Alexander E. Dreier,* and *Sheldon E. Steinbach;* for the American Federation of Labor and Congress of Industrial Organizations by *Harold Craig Becker, David J. Strom, Jonathan P. Hiatt,* and *Daniel W. Sherrick;* for the Anti-Defamation League by *Martin E. Karlinsky* and *Steven M. Freeman;* for the Asian American Legal Foundation by *Daniel C. Girard* and *Gordon M. Fauth, Jr.;* for Banks Broadcasting, Inc., by *Elizabeth G. Taylor;* for the Black Women Lawyers Association of Greater Chicago, Inc., by *Sharon E. Jones;* for the Boston Bar Association et al. by *Thomas E. Dwyer, Jr.,* and *Joseph L. Kociubes;* for the Carnegie Mellon University et al. by *W. Thomas McGough, Jr., Kathy M. Banke, Gary L. Kaplan,* and *Edward N. Stoner II;* for the Coalition for Economic Equity et al. by *Eva J. Paterson* and *Eric K. Yamamoto;*

stantial promise for success in law school" and "a strong like-
lihood of succeeding in the practice of law and contributing in
diverse ways to the well-being of others." App. 110. More
broadly, the Law School seeks "a mix of students with vary-
ing backgrounds and experiences who will respect and learn
from each other." *Ibid.* In 1992, the dean of the Law
School charged a faculty committee with crafting a written
admissions policy to implement these goals. In particular,
the Law School sought to ensure that its efforts to achieve
student body diversity complied with this Court's most re-
cent ruling on the use of race in university admissions. See
*Regents of Univ. of Cal.* v. *Bakke,* 438 U.S. 265 (1978).

---

for the Committee of Concerned Black Graduates of ABA Accredited Law
Schools et al. by *Mary Mack Adu;* for the Criminal Justice Legal Founda-
tion by *Kent S. Scheidegger;* for the Equal Employment Advisory Council
by *Jeffrey A. Norris* and *Ann Elizabeth Reesman;* for Exxon Mobil Corp.
by *Richard R. Brann;* for General Motors Corp. by *Kenneth S. Geller,
Eileen Penner,* and *Thomas A. Gottschalk;* for Human Rights Advocates
et al. by *Constance de la Vega;* for the Massachusetts Institute of Technol-
ogy et al. by *Donald B. Ayer, Elizabeth Rees, Debra L. Zumwalt,* and
*Stacey J. Mobley;* for the Massachusetts School of Law by *Lawrence R.
Velvel;* for the National Asian Pacific American Legal Consortium et al.
by *Mark A. Packman, Karen K. Narasaki, Vincent A. Eng,* and *Trang Q.
Tran;* for the National School Boards Association et al. by *Julie Under-
wood* and *Naomi Gittins;* for the New York State Black and Puerto Rican
Legislative Caucus by *Victor Goode;* for Veterans of the Southern Civil
Rights Movement et al. by *Mitchell Zimmerman;* for 3M et al. by *David
W. DeBruin, Deanne E. Maynard, Daniel Mach, Russell W. Porter, Jr.,
Charles R. Wall, Martin J. Barrington, Deval L. Patrick, William J.
O'Brien, Gary P. Van Graafeiland, Kathryn A. Oberly, Randall E. Mehr-
berg, Donald M. Remy, Ben W. Heineman, Jr., Brackett B. Denniston III,
Elpidio Villarreal, Wayne A. Budd, J. Richard Smith, Stewart S. Hudnut,
John A. Shutkin, Theodore L. Banks, Kenneth C. Frazier, David R. An-
drews, Jeffrey B. Kinder, Teresa M. Holland, Charles W. Gerdts III, John
L. Sander, Mark P. Klein,* and *Stephen P. Sawyer;* for Ward Connerly by
*Manuel S. Klausner* and *Patrick J. Manshardt;* for Representative John
Conyers, Jr., et al. by *Paul J. Lawrence* and *Anthony R. Miles;* and for
Representative Richard A. Gephardt et al. by *Andrew L. Sandler* and
*Mary L. Smith.*

Upon the unanimous adoption of the committee's report by the Law School faculty, it became the Law School's official admissions policy.

The hallmark of that policy is its focus on academic ability coupled with a flexible assessment of applicants' talents, experiences, and potential "to contribute to the learning of those around them." App. 111. The policy requires admissions officials to evaluate each applicant based on all the information available in the file, including a personal statement, letters of recommendation, and an essay describing the ways in which the applicant will contribute to the life and diversity of the Law School. *Id.*, at 83–84, 114–121. In reviewing an applicant's file, admissions officials must consider the applicant's undergraduate grade point average (GPA) and Law School Admission Test (LSAT) score because they are important (if imperfect) predictors of academic success in law school. *Id.*, at 112. The policy stresses that "no applicant should be admitted unless we expect that applicant to do well enough to graduate with no serious academic problems." *Id.*, at 111.

The policy makes clear, however, that even the highest possible score does not guarantee admission to the Law School. *Id.*, at 113. Nor does a low score automatically disqualify an applicant. *Ibid.* Rather, the policy requires admissions officials to look beyond grades and test scores to other criteria that are important to the Law School's educational objectives. *Id.*, at 114. So-called "'soft' variables" such as "the enthusiasm of recommenders, the quality of the undergraduate institution, the quality of the applicant's essay, and the areas and difficulty of undergraduate course selection" are all brought to bear in assessing an "applicant's likely contributions to the intellectual and social life of the institution." *Ibid.*

The policy aspires to "achieve that diversity which has the potential to enrich everyone's education and thus make a law school class stronger than the sum of its parts." *Id.*, at 118.

The policy does not restrict the types of diversity contributions eligible for "substantial weight" in the admissions process, but instead recognizes "many possible bases for diversity admissions." *Id.*, at 118, 120. The policy does, however, reaffirm the Law School's longstanding commitment to "one particular type of diversity," that is, "racial and ethnic diversity with special reference to the inclusion of students from groups which have been historically discriminated against, like African-Americans, Hispanics and Native Americans, who without this commitment might not be represented in our student body in meaningful numbers." *Id.*, at 120. By enrolling a "'critical mass' of [underrepresented] minority students," the Law School seeks to "ensur[e] their ability to make unique contributions to the character of the Law School." *Id.*, at 120–121.

The policy does not define diversity "solely in terms of racial and ethnic status." *Id.*, at 121. Nor is the policy "insensitive to the competition among all students for admission to the [L]aw [S]chool." *Ibid.* Rather, the policy seeks to guide admissions officers in "producing classes both diverse and academically outstanding, classes made up of students who promise to continue the tradition of outstanding contribution by Michigan Graduates to the legal profession." *Ibid.*

## B

Petitioner Barbara Grutter is a white Michigan resident who applied to the Law School in 1996 with a 3.8 GPA and 161 LSAT score. The Law School initially placed petitioner on a waiting list, but subsequently rejected her application. In December 1997, petitioner filed suit in the United States District Court for the Eastern District of Michigan against the Law School, the Regents of the University of Michigan, Lee Bollinger (Dean of the Law School from 1987 to 1994, and President of the University of Michigan from 1996 to 2002), Jeffrey Lehman (Dean of the Law School), and Dennis Shields (Director of Admissions at the Law School from 1991

until 1998). Petitioner alleged that respondents discriminated against her on the basis of race in violation of the Fourteenth Amendment; Title VI of the Civil Rights Act of 1964, 78 Stat. 252, 42 U. S. C. § 2000d; and Rev. Stat. § 1977, as amended, 42 U. S. C. § 1981.

Petitioner further alleged that her application was rejected because the Law School uses race as a "predominant" factor, giving applicants who belong to certain minority groups "a significantly greater chance of admission than students with similar credentials from disfavored racial groups." App. 33–34. Petitioner also alleged that respondents "had no compelling interest to justify their use of race in the admissions process." *Id.*, at 34. Petitioner requested compensatory and punitive damages, an order requiring the Law School to offer her admission, and an injunction prohibiting the Law School from continuing to discriminate on the basis of race. *Id.*, at 36. Petitioner clearly has standing to bring this lawsuit. *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U. S. 656, 666 (1993).

The District Court granted petitioner's motion for class certification and for bifurcation of the trial into liability and damages phases. The class was defined as " 'all persons who (A) applied for and were not granted admission to the University of Michigan Law School for the academic years since (and including) 1995 until the time that judgment is entered herein; and (B) were members of those racial or ethnic groups, including Caucasian, that Defendants treated less favorably in considering their applications for admission to the Law School.' " App. to Pet. for Cert. 191a–192a.

The District Court heard oral argument on the parties' cross-motions for summary judgment on December 22, 2000. Taking the motions under advisement, the District Court indicated that it would decide as a matter of law whether the Law School's asserted interest in obtaining the educational benefits that flow from a diverse student body was compel-

ling. The District Court also indicated that it would conduct a bench trial on the extent to which race was a factor in the Law School's admissions decisions, and whether the Law School's consideration of race in admissions decisions constituted a race-based double standard.

During the 15-day bench trial, the parties introduced extensive evidence concerning the Law School's use of race in the admissions process. Dennis Shields, Director of Admissions when petitioner applied to the Law School, testified that he did not direct his staff to admit a particular percentage or number of minority students, but rather to consider an applicant's race along with all other factors. *Id.*, at 206a. Shields testified that at the height of the admissions season, he would frequently consult the so-called "daily reports" that kept track of the racial and ethnic composition of the class (along with other information such as residency status and gender). *Id.*, at 207a. This was done, Shields testified, to ensure that a critical mass of underrepresented minority students would be reached so as to realize the educational benefits of a diverse student body. *Ibid.* Shields stressed, however, that he did not seek to admit any particular number or percentage of underrepresented minority students. *Ibid.*

Erica Munzel, who succeeded Shields as Director of Admissions, testified that " 'critical mass' " means " 'meaningful numbers' " or " 'meaningful representation,' " which she understood to mean a number that encourages underrepresented minority students to participate in the classroom and not feel isolated. *Id.*, at 208a–209a. Munzel stated there is no number, percentage, or range of numbers or percentages that constitute critical mass. *Id.*, at 209a. Munzel also asserted that she must consider the race of applicants because a critical mass of underrepresented minority students could not be enrolled if admissions decisions were based primarily on undergraduate GPAs and LSAT scores. *Ibid.*

The current Dean of the Law School, Jeffrey Lehman, also testified. Like the other Law School witnesses, Lehman did

not quantify critical mass in terms of numbers or percentages. *Id.*, at 211a. He indicated that critical mass means numbers such that underrepresented minority students do not feel isolated or like spokespersons for their race. *Ibid.* When asked about the extent to which race is considered in admissions, Lehman testified that it varies from one applicant to another. *Ibid.* In some cases, according to Lehman's testimony, an applicant's race may play no role, while in others it may be a "'determinative'" factor. *Ibid.*

The District Court heard extensive testimony from Professor Richard Lempert, who chaired the faculty committee that drafted the 1992 policy. Lempert emphasized that the Law School seeks students with diverse interests and backgrounds to enhance classroom discussion and the educational experience both inside and outside the classroom. *Id.*, at 213a. When asked about the policy's "'commitment to racial and ethnic diversity with special reference to the inclusion of students from groups which have been historically discriminated against,'" Lempert explained that this language did not purport to remedy past discrimination, but rather to include students who may bring to the Law School a perspective different from that of members of groups which have not been the victims of such discrimination. *Ibid.* Lempert acknowledged that other groups, such as Asians and Jews, have experienced discrimination, but explained they were not mentioned in the policy because individuals who are members of those groups were already being admitted to the Law School in significant numbers. *Ibid.*

Kent Syverud was the final witness to testify about the Law School's use of race in admissions decisions. Syverud was a professor at the Law School when the 1992 admissions policy was adopted and is now Dean of Vanderbilt Law School. In addition to his testimony at trial, Syverud submitted several expert reports on the educational benefits of diversity. Syverud's testimony indicated that when a critical mass of underrepresented minority students is pres-

ent, racial stereotypes lose their force because nonminority students learn there is no "'minority viewpoint'" but rather a variety of viewpoints among minority students. *Id.*, at 215a.

In an attempt to quantify the extent to which the Law School actually considers race in making admissions decisions, the parties introduced voluminous evidence at trial. Relying on data obtained from the Law School, petitioner's expert, Dr. Kinley Larntz, generated and analyzed "admissions grids" for the years in question (1995–2000). These grids show the number of applicants and the number of admittees for all combinations of GPAs and LSAT scores. Dr. Larntz made "'cell-by-cell'" comparisons between applicants of different races to determine whether a statistically significant relationship existed between race and admission rates. He concluded that membership in certain minority groups "'is an extremely strong factor in the decision for acceptance,'" and that applicants from these minority groups "'are given an extremely large allowance for admission'" as compared to applicants who are members of nonfavored groups. *Id.*, at 218a–220a. Dr. Larntz conceded, however, that race is not the predominant factor in the Law School's admissions calculus. 12 Tr. 11–13 (Feb. 10, 2001).

Dr. Stephen Raudenbush, the Law School's expert, focused on the predicted effect of eliminating race as a factor in the Law School's admission process. In Dr. Raudenbush's view, a race-blind admissions system would have a "'very dramatic,'" negative effect on underrepresented minority admissions. App. to Pet. for Cert. 223a. He testified that in 2000, 35 percent of underrepresented minority applicants were admitted. *Ibid.* Dr. Raudenbush predicted that if race were not considered, only 10 percent of those applicants would have been admitted. *Ibid.* Under this scenario, underrepresented minority students would have constituted 4 percent of the entering class in 2000 instead of the actual figure of 14.5 percent. *Ibid.*

In the end, the District Court concluded that the Law School's use of race as a factor in admissions decisions was unlawful. Applying strict scrutiny, the District Court determined that the Law School's asserted interest in assembling a diverse student body was not compelling because "the attainment of a racially diverse class . . . was not recognized as such by *Bakke* and it is not a remedy for past discrimination." *Id.*, at 246a. The District Court went on to hold that even if diversity were compelling, the Law School had not narrowly tailored its use of race to further that interest. The District Court granted petitioner's request for declaratory relief and enjoined the Law School from using race as a factor in its admissions decisions. The Court of Appeals entered a stay of the injunction pending appeal.

Sitting en banc, the Court of Appeals reversed the District Court's judgment and vacated the injunction. The Court of Appeals first held that Justice Powell's opinion in *Bakke* was binding precedent establishing diversity as a compelling state interest. According to the Court of Appeals, Justice Powell's opinion with respect to diversity constituted the controlling rationale for the judgment of this Court under the analysis set forth in *Marks* v. *United States,* 430 U. S. 188 (1977). The Court of Appeals also held that the Law School's use of race was narrowly tailored because race was merely a "potential 'plus' factor" and because the Law School's program was "virtually identical" to the Harvard admissions program described approvingly by Justice Powell and appended to his *Bakke* opinion. 288 F. 3d 732, 746, 749 (CA6 2002).

Four dissenting judges would have held the Law School's use of race unconstitutional. Three of the dissenters, rejecting the majority's *Marks* analysis, examined the Law School's interest in student body diversity on the merits and concluded it was not compelling. The fourth dissenter, writing separately, found it unnecessary to decide whether diversity was a compelling interest because, like the other dissent-

ers, he believed that the Law School's use of race was not narrowly tailored to further that interest.

We granted certiorari, 537 U. S. 1043 (2002), to resolve the disagreement among the Courts of Appeals on a question of national importance: Whether diversity is a compelling interest that can justify the narrowly tailored use of race in selecting applicants for admission to public universities. Compare *Hopwood* v. *Texas,* 78 F. 3d 932 (CA5 1996) *(Hopwood I)* (holding that diversity is not a compelling state interest), with *Smith* v. *University of Wash. Law School,* 233 F. 3d 1188 (CA9 2000) (holding that it is).

## II

## A

We last addressed the use of race in public higher education over 25 years ago. In the landmark *Bakke* case, we reviewed a racial set-aside program that reserved 16 out of 100 seats in a medical school class for members of certain minority groups. 438 U. S. 265 (1978). The decision produced six separate opinions, none of which commanded a majority of the Court. Four Justices would have upheld the program against all attack on the ground that the government can use race to "remedy disadvantages cast on minorities by past racial prejudice." *Id.,* at 325 (joint opinion of Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting in part). Four other Justices avoided the constitutional question altogether and struck down the program on statutory grounds. *Id.,* at 408 (opinion of STEVENS, J., joined by Burger, C. J., and Stewart and REHNQUIST, JJ., concurring in judgment in part and dissenting in part). Justice Powell provided a fifth vote not only for invalidating the set-aside program, but also for reversing the state court's injunction against any use of race whatsoever. The only holding for the Court in *Bakke* was that a "State has a substantial interest that legitimately may be served by a properly devised admissions program involv-

ing the competitive consideration of race and ethnic origin."
*Id.*, at 320. Thus, we reversed that part of the lower court's
judgment that enjoined the university "from any consider-
ation of the race of any applicant." *Ibid.*

Since this Court's splintered decision in *Bakke*, Justice
Powell's opinion announcing the judgment of the Court has
served as the touchstone for constitutional analysis of race-
conscious admissions policies. Public and private universi-
ties across the Nation have modeled their own admissions
programs on Justice Powell's views on permissible race-
conscious policies. See, *e. g.*, Brief for Judith Areen et al. as
*Amici Curiae* 12–13 (law school admissions programs em-
ploy "methods designed from and based on Justice Powell's
opinion in *Bakke*"); Brief for Amherst College et al. as *Amici
Curiae* 27 ("After *Bakke*, each of the *amici* (and undoubtedly
other selective colleges and universities as well) reviewed
their admissions procedures in light of Justice Powell's opin-
ion . . . and set sail accordingly"). We therefore discuss Jus-
tice Powell's opinion in some detail.

Justice Powell began by stating that "[t]he guarantee of
equal protection cannot mean one thing when applied to one
individual and something else when applied to a person of
another color. If both are not accorded the same protection,
then it is not equal." *Bakke*, 438 U. S., at 289–290. In Jus-
tice Powell's view, when governmental decisions "touch upon
an individual's race or ethnic background, he is entitled to a
judicial determination that the burden he is asked to bear on
that basis is precisely tailored to serve a compelling govern-
mental interest." *Id.*, at 299. Under this exacting stand-
ard, only one of the interests asserted by the university sur-
vived Justice Powell's scrutiny.

First, Justice Powell rejected an interest in " 'reducing the
historic deficit of traditionally disfavored minorities in medi-
cal schools and in the medical profession' " as an unlawful
interest in racial balancing. *Id.*, at 306–307. Second, Jus-
tice Powell rejected an interest in remedying societal dis-

crimination because such measures would risk placing unnecessary burdens on innocent third parties "who bear no responsibility for whatever harm the beneficiaries of the special admissions program are thought to have suffered." *Id.*, at 310. Third, Justice Powell rejected an interest in "increasing the number of physicians who will practice in communities currently underserved," concluding that even if such an interest could be compelling in some circumstances the program under review was not "geared to promote that goal." *Id.*, at 306, 310.

Justice Powell approved the university's use of race to further only one interest: "the attainment of a diverse student body." *Id.*, at 311. With the important proviso that "constitutional limitations protecting individual rights may not be disregarded," Justice Powell grounded his analysis in the academic freedom that "long has been viewed as a special concern of the First Amendment." *Id.*, at 312, 314. Justice Powell emphasized that nothing less than the " 'nation's future depends upon leaders trained through wide exposure' to the ideas and mores of students as diverse as this Nation of many peoples." *Id.*, at 313 (quoting *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589, 603 (1967)). In seeking the "right to select those students who will contribute the most to the 'robust exchange of ideas,' " a university seeks "to achieve a goal that is of paramount importance in the fulfillment of its mission." 438 U. S., at 313. Both "tradition and experience lend support to the view that the contribution of diversity is substantial." *Ibid.*

Justice Powell was, however, careful to emphasize that in his view race "is only one element in a range of factors a university properly may consider in attaining the goal of a heterogeneous student body." *Id.*, at 314. For Justice Powell, "[i]t is not an interest in simple ethnic diversity, in which a specified percentage of the student body is in effect guaranteed to be members of selected ethnic groups," that

can justify the use of race. *Id.*, at 315. Rather, "[t]he diversity that furthers a compelling state interest encompasses a far broader array of qualifications and characteristics of which racial or ethnic origin is but a single though important element." *Ibid.*

In the wake of our fractured decision in *Bakke,* courts have struggled to discern whether Justice Powell's diversity rationale, set forth in part of the opinion joined by no other Justice, is nonetheless binding precedent under *Marks.* In that case, we explained that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." 430 U. S., at 193 (internal quotation marks and citation omitted). As the divergent opinions of the lower courts demonstrate, however, "[t]his test is more easily stated than applied to the various opinions supporting the result in *[Bakke]*." *Nichols* v. *United States,* 511 U. S. 738, 745–746 (1994). Compare, *e. g., Johnson* v. *Board of Regents of Univ. of Ga.,* 263 F. 3d 1234 (CA11 2001) (Justice Powell's diversity rationale was not the holding of the Court); *Hopwood* v. *Texas,* 236 F. 3d 256, 274–275 (CA5 2000) *(Hopwood II)* (same); *Hopwood I,* 78 F. 3d 932 (CA5 1996) (same), with *Smith* v. *University of Wash. Law School,* 233 F. 3d, at 1199 (Justice Powell's opinion, including the diversity rationale, is controlling under *Marks*).

We do not find it necessary to decide whether Justice Powell's opinion is binding under *Marks.* It does not seem "useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it." *Nichols* v. *United States, supra,* at 745–746. More important, for the reasons set out below, today we endorse Justice Powell's view that student body diversity is a compelling state interest that can justify the use of race in university admissions.

## B

The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U. S. Const., Amdt. 14, §2. Because the Fourteenth Amendment "protect[s] *persons,* not *groups,*" all "governmental action based on race—a *group* classification long recognized as in most circumstances irrelevant and therefore prohibited—should be subjected to detailed judicial inquiry to ensure that the *personal* right to equal protection of the laws has not been infringed." *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 227 (1995) (emphasis in original; internal quotation marks and citation omitted). We are a "free people whose institutions are founded upon the doctrine of equality." *Loving* v. *Virginia,* 388 U. S. 1, 11 (1967) (internal quotation marks and citation omitted). It follows from that principle that "government may treat people differently because of their race only for the most compelling reasons." *Adarand Constructors, Inc.* v. *Peña,* 515 U. S., at 227.

We have held that all racial classifications imposed by government "must be analyzed by a reviewing court under strict scrutiny." *Ibid.* This means that such classifications are constitutional only if they are narrowly tailored to further compelling governmental interests. "Absent searching judicial inquiry into the justification for such race-based measures," we have no way to determine what "classifications are 'benign' or 'remedial' and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics." *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469, 493 (1989) (plurality opinion). We apply strict scrutiny to all racial classifications to "'smoke out' illegitimate uses of race by assuring that [government] is pursuing a goal important enough to warrant use of a highly suspect tool." *Ibid.*

Strict scrutiny is not "strict in theory, but fatal in fact." *Adarand Constructors, Inc.* v. *Peña, supra,* at 237 (internal quotation marks and citation omitted). Although all gov-

ernmental uses of race are subject to strict scrutiny, not all are invalidated by it. As we have explained, "whenever the government treats any person unequally because of his or her race, that person has suffered an injury that falls squarely within the language and spirit of the Constitution's guarantee of equal protection." 515 U. S., at 229–230. But that observation "says nothing about the ultimate validity of any particular law; that determination is the job of the court applying strict scrutiny." *Id.,* at 230. When race-based action is necessary to further a compelling governmental interest, such action does not violate the constitutional guarantee of equal protection so long as the narrow-tailoring requirement is also satisfied.

Context matters when reviewing race-based governmental action under the Equal Protection Clause. See *Gomillion* v. *Lightfoot,* 364 U. S. 339, 343–344 (1960) (admonishing that, "in dealing with claims under broad provisions of the Constitution, which derive content by an interpretive process of inclusion and exclusion, it is imperative that generalizations, based on and qualified by the concrete situations that gave rise to them, must not be applied out of context in disregard of variant controlling facts"). In *Adarand Constructors, Inc.* v. *Peña,* we made clear that strict scrutiny must take "'relevant differences' into account." 515 U. S., at 228. Indeed, as we explained, that is its "fundamental purpose." *Ibid.* Not every decision influenced by race is equally objectionable, and strict scrutiny is designed to provide a framework for carefully examining the importance and the sincerity of the reasons advanced by the governmental decisionmaker for the use of race in that particular context.

## III

### A

With these principles in mind, we turn to the question whether the Law School's use of race is justified by a compelling state interest. Before this Court, as they have

throughout this litigation, respondents assert only one justification for their use of race in the admissions process: obtaining "the educational benefits that flow from a diverse student body." Brief for Respondent Bollinger et al. i. In other words, the Law School asks us to recognize, in the context of higher education, a compelling state interest in student body diversity.

We first wish to dispel the notion that the Law School's argument has been foreclosed, either expressly or implicitly, by our affirmative-action cases decided since *Bakke.* It is true that some language in those opinions might be read to suggest that remedying past discrimination is the only permissible justification for race-based governmental action. See, *e. g., Richmond* v. *J. A. Croson Co., supra,* at 493 (plurality opinion) (stating that unless classifications based on race are "strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility"). But we have never held that the only governmental use of race that can survive strict scrutiny is remedying past discrimination. Nor, since *Bakke,* have we directly addressed the use of race in the context of public higher education. Today, we hold that the Law School has a compelling interest in attaining a diverse student body.

The Law School's educational judgment that such diversity is essential to its educational mission is one to which we defer. The Law School's assessment that diversity will, in fact, yield educational benefits is substantiated by respondents and their *amici.* Our scrutiny of the interest asserted by the Law School is no less strict for taking into account complex educational judgments in an area that lies primarily within the expertise of the university. Our holding today is in keeping with our tradition of giving a degree of deference to a university's academic decisions, within constitutionally prescribed limits. See *Regents of Univ. of Mich.* v. *Ewing,* 474 U. S. 214, 225 (1985); *Board of Curators of Univ. of Mo.*

v. *Horowitz*, 435 U. S. 78, 96, n. 6 (1978); *Bakke*, 438 U. S., at 319, n. 53 (opinion of Powell, J.).

We have long recognized that, given the important purpose of public education and the expansive freedoms of speech and thought associated with the university environment, universities occupy a special niche in our constitutional tradition. See, *e. g.*, *Wieman* v. *Updegraff*, 344 U. S. 183, 195 (1952) (Frankfurter, J., concurring); *Sweezy* v. *New Hampshire*, 354 U. S. 234, 250 (1957); *Shelton* v. *Tucker*, 364 U. S. 479, 487 (1960); *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S., at 603. In announcing the principle of student body diversity as a compelling state interest, Justice Powell invoked our cases recognizing a constitutional dimension, grounded in the First Amendment, of educational autonomy: "The freedom of a university to make its own judgments as to education includes the selection of its student body." *Bakke, supra,* at 312. From this premise, Justice Powell reasoned that by claiming "the right to select those students who will contribute the most to the 'robust exchange of ideas,'" a university "seek[s] to achieve a goal that is of paramount importance in the fulfillment of its mission." 438 U. S., at 313 (quoting *Keyishian* v. *Board of Regents of Univ. of State of N. Y., supra,* at 603). Our conclusion that the Law School has a compelling interest in a diverse student body is informed by our view that attaining a diverse student body is at the heart of the Law School's proper institutional mission, and that "good faith" on the part of a university is "presumed" absent "a showing to the contrary." 438 U. S., at 318–319.

As part of its goal of "assembling a class that is both exceptionally academically qualified and broadly diverse," the Law School seeks to "enroll a 'critical mass' of minority students." Brief for Respondent Bollinger et al. 13. The Law School's interest is not simply "to assure within its student body some specified percentage of a particular group merely because of its race or ethnic origin." *Bakke,* 438 U. S., at

307 (opinion of Powell, J.). That would amount to outright racial balancing, which is patently unconstitutional. *Ibid.;* *Freeman* v. *Pitts,* 503 U. S. 467, 494 (1992) ("Racial balance is not to be achieved for its own sake"); *Richmond* v. *J. A. Croson Co.,* 488 U. S., at 507. Rather, the Law School's concept of critical mass is defined by reference to the educational benefits that diversity is designed to produce.

These benefits are substantial. As the District Court emphasized, the Law School's admissions policy promotes "cross-racial understanding," helps to break down racial stereotypes, and "enables [students] to better understand persons of different races." App. to Pet. for Cert. 246a. These benefits are "important and laudable," because "classroom discussion is livelier, more spirited, and simply more enlightening and interesting" when the students have "the greatest possible variety of backgrounds." *Id.,* at 246a, 244a.

The Law School's claim of a compelling interest is further bolstered by its *amici,* who point to the educational benefits that flow from student body diversity. In addition to the expert studies and reports entered into evidence at trial, numerous studies show that student body diversity promotes learning outcomes, and "better prepares students for an increasingly diverse workforce and society, and better prepares them as professionals." Brief for American Educational Research Association et al. as *Amici Curiae* 3; see, *e. g.,* W. Bowen & D. Bok, The Shape of the River (1998); Diversity Challenged: Evidence on the Impact of Affirmative Action (G. Orfield & M. Kurlaender eds. 2001); Compelling Interest: Examining the Evidence on Racial Dynamics in Colleges and Universities (M. Chang, D. Witt, J. Jones, & K. Hakuta eds. 2003).

These benefits are not theoretical but real, as major American businesses have made clear that the skills needed in today's increasingly global marketplace can only be developed through exposure to widely diverse people, cultures, ideas, and viewpoints. Brief for 3M et al. as *Amici Curiae*

5; Brief for General Motors Corp. as *Amicus Curiae* 3–4. What is more, high-ranking retired officers and civilian leaders of the United States military assert that, "[b]ased on [their] decades of experience," a "highly qualified, racially diverse officer corps . . . is essential to the military's ability to fulfill its principle mission to provide national security." Brief for Julius W. Becton, Jr., et al. as *Amici Curiae* 5. The primary sources for the Nation's officer corps are the service academies and the Reserve Officers Training Corps (ROTC), the latter comprising students already admitted to participating colleges and universities. *Ibid.* At present, "the military cannot achieve an officer corps that is *both* highly qualified *and* racially diverse unless the service academies and the ROTC used limited race-conscious recruiting and admissions policies." *Ibid.* (emphasis in original). To fulfill its mission, the military "must be selective in admissions for training and education for the officer corps, *and* it must train and educate a highly qualified, racially diverse officer corps in a racially diverse educational setting." *Id.*, at 29 (emphasis in original). We agree that "[i]t requires only a small step from this analysis to conclude that our country's other most selective institutions must remain both diverse and selective." *Ibid.*

We have repeatedly acknowledged the overriding importance of preparing students for work and citizenship, describing education as pivotal to "sustaining our political and cultural heritage" with a fundamental role in maintaining the fabric of society. *Plyler* v. *Doe*, 457 U. S. 202, 221 (1982). This Court has long recognized that "education . . . is the very foundation of good citizenship." *Brown* v. *Board of Education*, 347 U. S. 483, 493 (1954). For this reason, the diffusion of knowledge and opportunity through public institutions of higher education must be accessible to all individuals regardless of race or ethnicity. The United States, as *amicus curiae*, affirms that "[e]nsuring that public institutions are open and available to all segments of American

society, including people of all races and ethnicities, represents a paramount government objective." Brief for United States as *Amicus Curiae* 13. And, "[n]owhere is the importance of such openness more acute than in the context of higher education." *Ibid.* Effective participation by members of all racial and ethnic groups in the civic life of our Nation is essential if the dream of one Nation, indivisible, is to be realized.

Moreover, universities, and in particular, law schools, represent the training ground for a large number of our Nation's leaders. *Sweatt* v. *Painter*, 339 U. S. 629, 634 (1950) (describing law school as a "proving ground for legal learning and practice"). Individuals with law degrees occupy roughly half the state governorships, more than half the seats in the United States Senate, and more than a third of the seats in the United States House of Representatives. See Brief for Association of American Law Schools as *Amicus Curiae* 5–6. The pattern is even more striking when it comes to highly selective law schools. A handful of these schools accounts for 25 of the 100 United States Senators, 74 United States Courts of Appeals judges, and nearly 200 of the more than 600 United States District Court judges. *Id.*, at 6.

In order to cultivate a set of leaders with legitimacy in the eyes of the citizenry, it is necessary that the path to leadership be visibly open to talented and qualified individuals of every race and ethnicity. All members of our heterogeneous society must have confidence in the openness and integrity of the educational institutions that provide this training. As we have recognized, law schools "cannot be effective in isolation from the individuals and institutions with which the law interacts." See *Sweatt* v. *Painter, supra,* at 634. Access to legal education (and thus the legal profession) must be inclusive of talented and qualified individuals of every race and ethnicity, so that all members of our heterogeneous society

may participate in the educational institutions that provide the training and education necessary to succeed in America.

The Law School does not premise its need for critical mass on "any belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue." Brief for Respondent Bollinger et al. 30. To the contrary, diminishing the force of such stereotypes is both a crucial part of the Law School's mission, and one that it cannot accomplish with only token numbers of minority students. Just as growing up in a particular region or having particular professional experiences is likely to affect an individual's views, so too is one's own, unique experience of being a racial minority in a society, like our own, in which race unfortunately still matters. The Law School has determined, based on its experience and expertise, that a "critical mass" of underrepresented minorities is necessary to further its compelling interest in securing the educational benefits of a diverse student body.

## B

Even in the limited circumstance when drawing racial distinctions is permissible to further a compelling state interest, government is still "constrained in how it may pursue that end: [T]he means chosen to accomplish the [government's] asserted purpose must be specifically and narrowly framed to accomplish that purpose." *Shaw* v. *Hunt*, 517 U. S. 899, 908 (1996) (internal quotation marks and citation omitted). The purpose of the narrow tailoring requirement is to ensure that "the means chosen 'fit' th[e] compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Richmond* v. *J. A. Croson Co.*, 488 U. S., at 493 (plurality opinion).

Since *Bakke*, we have had no occasion to define the contours of the narrow-tailoring inquiry with respect to race-conscious university admissions programs. That inquiry

must be calibrated to fit the distinct issues raised by the use of race to achieve student body diversity in public higher education. Contrary to JUSTICE KENNEDY's assertions, we do not "abando[n] strict scrutiny," see *post*, at 394 (dissenting opinion). Rather, as we have already explained, *supra*, at 327, we adhere to *Adarand*'s teaching that the very purpose of strict scrutiny is to take such "relevant differences into account." 515 U. S., at 228 (internal quotation marks omitted).

To be narrowly tailored, a race-conscious admissions program cannot use a quota system—it cannot "insulat[e] each category of applicants with certain desired qualifications from competition with all other applicants." *Bakke*, 438 U. S., at 315 (opinion of Powell, J.). Instead, a university may consider race or ethnicity only as a " 'plus' in a particular applicant's file," without "insulat[ing] the individual from comparison with all other candidates for the available seats." *Id.*, at 317. In other words, an admissions program must be "flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight." *Ibid.*

We find that the Law School's admissions program bears the hallmarks of a narrowly tailored plan. As Justice Powell made clear in *Bakke*, truly individualized consideration demands that race be used in a flexible, nonmechanical way. It follows from this mandate that universities cannot establish quotas for members of certain racial groups or put members of those groups on separate admissions tracks. See *id.*, at 315–316. Nor can universities insulate applicants who belong to certain racial or ethnic groups from the competition for admission. *Ibid.* Universities can, however, consider race or ethnicity more flexibly as a "plus" factor in the context of individualized consideration of each and every applicant. *Ibid.*

We are satisfied that the Law School's admissions program, like the Harvard plan described by Justice Powell, does not operate as a quota. Properly understood, a "quota" is a program in which a certain fixed number or proportion of opportunities are "reserved exclusively for certain minority groups." *Richmond* v. *J. A. Croson Co., supra,* at 496 (plurality opinion). Quotas " 'impose a fixed number or percentage which must be attained, or which cannot be exceeded,' " *Sheet Metal Workers* v. *EEOC,* 478 U. S. 421, 495 (1986) (O'CONNOR, J., concurring in part and dissenting in part), and "insulate the individual from comparison with all other candidates for the available seats," *Bakke, supra,* at 317 (opinion of Powell, J.). In contrast, "a permissible goal . . . require[s] only a good-faith effort . . . to come within a range demarcated by the goal itself," *Sheet Metal Workers* v. *EEOC, supra,* at 495, and permits consideration of race as a "plus" factor in any given case while still ensuring that each candidate "compete[s] with all other qualified applicants," *Johnson* v. *Transportation Agency, Santa Clara Cty.,* 480 U. S. 616, 638 (1987).

Justice Powell's distinction between the medical school's rigid 16-seat quota and Harvard's flexible use of race as a "plus" factor is instructive. Harvard certainly had minimum *goals* for minority enrollment, even if it had no specific number firmly in mind. See *Bakke, supra,* at 323 (opinion of Powell, J.) ("10 or 20 black students could not begin to bring to their classmates and to each other the variety of points of view, backgrounds and experiences of blacks in the United States"). What is more, Justice Powell flatly rejected the argument that Harvard's program was "the functional equivalent of a quota" merely because it had some " 'plus' " for race, or gave greater "weight" to race than to some other factors, in order to achieve student body diversity. 438 U. S., at 317–318.

The Law School's goal of attaining a critical mass of underrepresented minority students does not transform its pro-

gram into a quota. As the Harvard plan described by Justice Powell recognized, there is of course "some relationship between numbers and achieving the benefits to be derived from a diverse student body, and between numbers and providing a reasonable environment for those students admitted." *Id.*, at 323. "[S]ome attention to numbers," without more, does not transform a flexible admissions system into a rigid quota. *Ibid.* Nor, as JUSTICE KENNEDY posits, does the Law School's consultation of the "daily reports," which keep track of the racial and ethnic composition of the class (as well as of residency and gender), "sugges[t] there was no further attempt at individual review save for race itself" during the final stages of the admissions process. See *post*, at 392 (dissenting opinion). To the contrary, the Law School's admissions officers testified without contradiction that they never gave race any more or less weight based on the information contained in these reports. Brief for Respondent Bollinger et al. 43, n. 70 (citing App. in Nos. 01–1447 and 01–1516 (CA6), p. 7336). Moreover, as JUSTICE KENNEDY concedes, see *post*, at 390, between 1993 and 1998, the number of African-American, Latino, and Native-American students in each class at the Law School varied from 13.5 to 20.1 percent, a range inconsistent with a quota.

THE CHIEF JUSTICE believes that the Law School's policy conceals an attempt to achieve racial balancing, and cites admissions data to contend that the Law School discriminates among different groups within the critical mass. *Post*, at 380–386 (dissenting opinion). But, as THE CHIEF JUSTICE concedes, the number of underrepresented minority students who ultimately enroll in the Law School differs substantially from their representation in the applicant pool and varies considerably for each group from year to year. See *post*, at 385 (dissenting opinion).

That a race-conscious admissions program does not operate as a quota does not, by itself, satisfy the requirement of individualized consideration. When using race as a "plus"

factor in university admissions, a university's admissions program must remain flexible enough to ensure that each applicant is evaluated as an individual and not in a way that makes an applicant's race or ethnicity the defining feature of his or her application. The importance of this individualized consideration in the context of a race-conscious admissions program is paramount. See *Bakke*, 438 U. S., at 318, n. 52 (opinion of Powell, J.) (identifying the "denial . . . of th[e] right to individualized consideration" as the "principal evil" of the medical school's admissions program).

Here, the Law School engages in a highly individualized, holistic review of each applicant's file, giving serious consideration to all the ways an applicant might contribute to a diverse educational environment. The Law School affords this individualized consideration to applicants of all races. There is no policy, either *de jure* or *de facto*, of automatic acceptance or rejection based on any single "soft" variable. Unlike the program at issue in *Gratz* v. *Bollinger, ante,* p. 244, the Law School awards no mechanical, predetermined diversity "bonuses" based on race or ethnicity. See *ante*, at 271–272 (distinguishing a race-conscious admissions program that automatically awards 20 points based on race from the Harvard plan, which considered race but "did not contemplate that any single characteristic automatically ensured a specific and identifiable contribution to a university's diversity"). Like the Harvard plan, the Law School's admissions policy "is flexible enough to consider all pertinent elements of diversity in light of the particular qualifications of each applicant, and to place them on the same footing for consideration, although not necessarily according them the same weight." *Bakke, supra,* at 317 (opinion of Powell, J.).

We also find that, like the Harvard plan Justice Powell referenced in *Bakke,* the Law School's race-conscious admissions program adequately ensures that all factors that may contribute to student body diversity are meaningfully considered alongside race in admissions decisions. With re-

spect to the use of race itself, all underrepresented minority students admitted by the Law School have been deemed qualified. By virtue of our Nation's struggle with racial inequality, such students are both likely to have experiences of particular importance to the Law School's mission, and less likely to be admitted in meaningful numbers on criteria that ignore those experiences. See App. 120.

The Law School does not, however, limit in any way the broad range of qualities and experiences that may be considered valuable contributions to student body diversity. To the contrary, the 1992 policy makes clear "[t]here are many possible bases for diversity admissions," and provides examples of admittees who have lived or traveled widely abroad, are fluent in several languages, have overcome personal adversity and family hardship, have exceptional records of extensive community service, and have had successful careers in other fields. *Id.*, at 118–119. The Law School seriously considers each "applicant's promise of making a notable contribution to the class by way of a particular strength, attainment, or characteristic—*e. g.*, an unusual intellectual achievement, employment experience, nonacademic performance, or personal background." *Id.*, at 83–84. All applicants have the opportunity to highlight their own potential diversity contributions through the submission of a personal statement, letters of recommendation, and an essay describing the ways in which the applicant will contribute to the life and diversity of the Law School.

What is more, the Law School actually gives substantial weight to diversity factors besides race. The Law School frequently accepts nonminority applicants with grades and test scores lower than underrepresented minority applicants (and other nonminority applicants) who are rejected. See Brief for Respondent Bollinger et al. 10; App. 121–122. This shows that the Law School seriously weighs many other diversity factors besides race that can make a real and dispositive difference for nonminority applicants as well. By this

flexible approach, the Law School sufficiently takes into account, in practice as well as in theory, a wide variety of characteristics besides race and ethnicity that contribute to a diverse student body. JUSTICE KENNEDY speculates that "race is likely outcome determinative for many members of minority groups" who do not fall within the upper range of LSAT scores and grades. *Post*, at 389 (dissenting opinion). But the same could be said of the Harvard plan discussed approvingly by Justice Powell in *Bakke,* and indeed of any plan that uses race as one of many factors. See 438 U. S., at 316 ("'When the Committee on Admissions reviews the large middle group of applicants who are "admissible" and deemed capable of doing good work in their courses, the race of an applicant may tip the balance in his favor'").

Petitioner and the United States argue that the Law School's plan is not narrowly tailored because race-neutral means exist to obtain the educational benefits of student body diversity that the Law School seeks. We disagree. Narrow tailoring does not require exhaustion of every conceivable race-neutral alternative. Nor does it require a university to choose between maintaining a reputation for excellence or fulfilling a commitment to provide educational opportunities to members of all racial groups. See *Wygant* v. *Jackson Bd. of Ed.,* 476 U. S. 267, 280, n. 6 (1986) (alternatives must serve the interest "'about as well'"); *Richmond* v. *J. A. Croson Co.,* 488 U. S., at 509–510 (plurality opinion) (city had a "whole array of race-neutral" alternatives because changing requirements "would have [had] little detrimental effect on the city's interests"). Narrow tailoring does, however, require serious, good faith consideration of workable race-neutral alternatives that will achieve the diversity the university seeks. See *id.,* at 507 (set-aside plan not narrowly tailored where "there does not appear to have been any consideration of the use of race-neutral means"); *Wygant* v. *Jackson Bd. of Ed., supra,* at 280, n. 6 (narrow tailoring

"require[s] consideration" of "lawful alternative and less restrictive means").

We agree with the Court of Appeals that the Law School sufficiently considered workable race-neutral alternatives. The District Court took the Law School to task for failing to consider race-neutral alternatives such as "using a lottery system" or "decreasing the emphasis for all applicants on undergraduate GPA and LSAT scores." App. to Pet. for Cert. 251a. But these alternatives would require a dramatic sacrifice of diversity, the academic quality of all admitted students, or both.

The Law School's current admissions program considers race as one factor among many, in an effort to assemble a student body that is diverse in ways broader than race. Because a lottery would make that kind of nuanced judgment impossible, it would effectively sacrifice all other educational values, not to mention every other kind of diversity. So too with the suggestion that the Law School simply lower admissions standards for all students, a drastic remedy that would require the Law School to become a much different institution and sacrifice a vital component of its educational mission. The United States advocates "percentage plans," recently adopted by public undergraduate institutions in Texas, Florida, and California, to guarantee admission to all students above a certain class-rank threshold in every high school in the State. Brief for United States as *Amicus Curiae* 14–18. The United States does not, however, explain how such plans could work for graduate and professional schools. Moreover, even assuming such plans are race-neutral, they may preclude the university from conducting the individualized assessments necessary to assemble a student body that is not just racially diverse, but diverse along all the qualities valued by the university. We are satisfied that the Law School adequately considered race-neutral alternatives currently capable of producing a critical mass without forcing the Law School to abandon the academic selectivity that is the cornerstone of its educational mission.

We acknowledge that "there are serious problems of justice connected with the idea of preference itself." *Bakke*, 438 U. S., at 298 (opinion of Powell, J.). Narrow tailoring, therefore, requires that a race-conscious admissions program not unduly harm members of any racial group. Even remedial race-based governmental action generally "remains subject to continuing oversight to assure that it will work the least harm possible to other innocent persons competing for the benefit." *Id.*, at 308. To be narrowly tailored, a race-conscious admissions program must not "unduly burden individuals who are not members of the favored racial and ethnic groups." *Metro Broadcasting, Inc.* v. *FCC*, 497 U. S. 547, 630 (1990) (O'CONNOR, J., dissenting).

We are satisfied that the Law School's admissions program does not. Because the Law School considers "all pertinent elements of diversity," it can (and does) select nonminority applicants who have greater potential to enhance student body diversity over underrepresented minority applicants. See *Bakke, supra*, at 317 (opinion of Powell, J.). As Justice Powell recognized in *Bakke*, so long as a race-conscious admissions program uses race as a "plus" factor in the context of individualized consideration, a rejected applicant

> "will not have been foreclosed from all consideration for that seat simply because he was not the right color or had the wrong surname. . . . His qualifications would have been weighed fairly and competitively, and he would have no basis to complain of unequal treatment under the Fourteenth Amendment." 438 U. S., at 318.

We agree that, in the context of its individualized inquiry into the possible diversity contributions of all applicants, the Law School's race-conscious admissions program does not unduly harm nonminority applicants.

We are mindful, however, that "[a] core purpose of the Fourteenth Amendment was to do away with all governmentally imposed discrimination based on race." *Palmore* v. *Si-*

*doti,* 466 U. S. 429, 432 (1984). Accordingly, race-conscious admissions policies must be limited in time. This requirement reflects that racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands. Enshrining a permanent justification for racial preferences would offend this fundamental equal protection principle. We see no reason to exempt race-conscious admissions programs from the requirement that all governmental use of race must have a logical end point. The Law School, too, concedes that all "race-conscious programs must have reasonable durational limits." Brief for Respondent Bollinger et al. 32.

In the context of higher education, the durational requirement can be met by sunset provisions in race-conscious admissions policies and periodic reviews to determine whether racial preferences are still necessary to achieve student body diversity. Universities in California, Florida, and Washington State, where racial preferences in admissions are prohibited by state law, are currently engaged in experimenting with a wide variety of alternative approaches. Universities in other States can and should draw on the most promising aspects of these race-neutral alternatives as they develop. Cf. *United States* v. *Lopez,* 514 U. S. 549, 581 (1995) (KENNEDY, J., concurring) ("[T]he States may perform their role as laboratories for experimentation to devise various solutions where the best solution is far from clear").

The requirement that all race-conscious admissions programs have a termination point "assure[s] all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is a temporary matter, a measure taken in the service of the goal of equality itself." *Richmond* v. *J. A. Croson Co.,* 488 U. S., at 510 (plurality opinion); see also Nathanson & Bartnik, The Constitutionality of Preferential Treatment for Minority Applicants to Professional Schools,

58 Chicago Bar Rec. 282, 293 (May–June 1977) ("It would be a sad day indeed, were America to become a quota-ridden society, with each identifiable minority assigned proportional representation in every desirable walk of life. But that is not the rationale for programs of preferential treatment; the acid test of their justification will be their efficacy in eliminating the need for any racial or ethnic preferences at all").

We take the Law School at its word that it would "like nothing better than to find a race-neutral admissions formula" and will terminate its race-conscious admissions program as soon as practicable. See Brief for Respondent Bollinger et al. 34; *Bakke, supra,* at 317–318 (opinion of Powell, J.) (presuming good faith of university officials in the absence of a showing to the contrary). It has been 25 years since Justice Powell first approved the use of race to further an interest in student body diversity in the context of public higher education. Since that time, the number of minority applicants with high grades and test scores has indeed increased. See Tr. of Oral Arg. 43. We expect that 25 years from now, the use of racial preferences will no longer be necessary to further the interest approved today.

## IV

In summary, the Equal Protection Clause does not prohibit the Law School's narrowly tailored use of race in admissions decisions to further a compelling interest in obtaining the educational benefits that flow from a diverse student body. Consequently, petitioner's statutory claims based on Title VI and 42 U. S. C. § 1981 also fail. See *Bakke, supra,* at 287 (opinion of Powell, J.) ("Title VI . . . proscribe[s] only those racial classifications that would violate the Equal Protection Clause or the Fifth Amendment"); *General Building Contractors Assn., Inc.* v. *Pennsylvania,* 458 U. S. 375, 389–391 (1982) (the prohibition against discrimination in § 1981 is coextensive with the Equal Protection Clause). The judgment

of the Court of Appeals for the Sixth Circuit, accordingly, is affirmed.

*It is so ordered.*

JUSTICE GINSBURG, with whom JUSTICE BREYER joins, concurring.

The Court's observation that race-conscious programs "must have a logical end point," *ante,* at 342, accords with the international understanding of the office of affirmative action. The International Convention on the Elimination of All Forms of Racial Discrimination, ratified by the United States in 1994, see State Dept., Treaties in Force 422–423 (June 1996), endorses "special and concrete measures to ensure the adequate development and protection of certain racial groups or individuals belonging to them, for the purpose of guaranteeing them the full and equal enjoyment of human rights and fundamental freedoms." Annex to G. A. Res. 2106, 20 U. N. GAOR, 20th Sess., Res. Supp. (No. 14), p. 47, U. N. Doc. A/6014, Art. 2(2) (1965). But such measures, the Convention instructs, "shall in no case entail as a consequence the maintenance of unequal or separate rights for different racial groups after the objectives for which they were taken have been achieved." *Ibid.;* see also Art. 1(4) (similarly providing for temporally limited affirmative action); Convention on the Elimination of All Forms of Discrimination against Women, Annex to G. A. Res. 34/180, 34 U. N. GAOR, 34th Sess., Res. Supp. (No. 46), p. 194, U. N. Doc. A/34/46, Art. 4(1) (1979) (authorizing "temporary special measures aimed at accelerating *de facto* equality" that "shall be discontinued when the objectives of equality of opportunity and treatment have been achieved").

The Court further observes that "[i]t has been 25 years since Justice Powell [in *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265 (1978)] first approved the use of race to further an interest in student body diversity in the context of public higher education." *Ante,* at 343. For at least part of that

time, however, the law could not fairly be described as "settled," and in some regions of the Nation, overtly race-conscious admissions policies have been proscribed. See *Hopwood* v. *Texas*, 78 F. 3d 932 (CA5 1996); cf. *Wessmann* v. *Gittens*, 160 F. 3d 790 (CA1 1998); *Tuttle* v. *Arlington Cty. School Bd.*, 195 F. 3d 698 (CA4 1999); *Johnson* v. *Board of Regents of Univ. of Ga.*, 263 F. 3d 1234 (CA11 2001). Moreover, it was only 25 years before *Bakke* that this Court declared public school segregation unconstitutional, a declaration that, after prolonged resistance, yielded an end to a law-enforced racial caste system, itself the legacy of centuries of slavery. See *Brown* v. *Board of Education*, 347 U. S. 483 (1954); cf. *Cooper* v. *Aaron*, 358 U. S. 1 (1958).

It is well documented that conscious and unconscious race bias, even rank discrimination based on race, remain alive in our land, impeding realization of our highest values and ideals. See, *e. g., Gratz* v. *Bollinger, ante*, at 298–301 (GINSBURG, J., dissenting); *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200, 272–274 (1995) (GINSBURG, J., dissenting); Krieger, Civil Rights Perestroika: Intergroup Relations after Affirmative Action, 86 Calif. L. Rev. 1251, 1276–1291, 1303 (1998). As to public education, data for the years 2000–2001 show that 71.6% of African-American children and 76.3% of Hispanic children attended a school in which minorities made up a majority of the student body. See E. Frankenberg, C. Lee, & G. Orfield, A Multiracial Society with Segregated Schools: Are We Losing the Dream? p. 4 (Jan. 2003), http://www.civilrightsproject.harvard.edu/research/reseg03/AreWeLosingtheDream.pdf (as visited June 16, 2003, and available in Clerk of Court's case file). And schools in predominantly minority communities lag far behind others measured by the educational resources available to them. See *id.*, at 11; Brief for National Urban League et al. as *Amici Curiae* 11–12 (citing General Accounting Office, Per-Pupil Spending Differences Between Selected Inner City and Suburban Schools Varied by Metropolitan Area 17 (2002)).

However strong the public's desire for improved education systems may be, see P. Hart & R. Teeter, A National Priority: Americans Speak on Teacher Quality 2, 11 (2002) (public opinion research conducted for Educational Testing Service); No Child Left Behind Act of 2001, Pub. L. 107–110, 115 Stat. 1806, 20 U. S. C. § 7231 (2000 ed., Supp. I), it remains the current reality that many minority students encounter markedly inadequate and unequal educational opportunities. Despite these inequalities, some minority students are able to meet the high threshold requirements set for admission to the country's finest undergraduate and graduate educational institutions. As lower school education in minority communities improves, an increase in the number of such students may be anticipated. From today's vantage point, one may hope, but not firmly forecast, that over the next generation's span, progress toward nondiscrimination and genuinely equal opportunity will make it safe to sunset affirmative action.*

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in part and dissenting in part.

I join the opinion of THE CHIEF JUSTICE. As he demonstrates, the University of Michigan Law School's mystical

---

*As the Court explains, the admissions policy challenged here survives review under the standards stated in *Adarand Constructors, Inc.* v. *Peña*, 515 U. S. 200 (1995), *Richmond* v. *J. A. Croson Co.*, 488 U. S. 469 (1989), and Justice Powell's opinion in *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265 (1978). This case therefore does not require the Court to revisit whether all governmental classifications by race, whether designed to benefit or to burden a historically disadvantaged group, should be subject to the same standard of judicial review. Cf. *Gratz, ante,* at 301–302 (GINSBURG, J., dissenting); *Adarand,* 515 U. S., at 274, n. 8 (GINSBURG, J., dissenting). Nor does this case necessitate reconsideration whether interests other than "student body diversity," *ante,* at 325, rank as sufficiently important to justify a race-conscious government program. Cf. *Gratz, ante,* at 301–302 (GINSBURG, J., dissenting); *Adarand,* 515 U. S., at 273–274 (GINSBURG, J., dissenting).

"critical mass" justification for its discrimination by race challenges even the most gullible mind. The admissions statistics show it to be a sham to cover a scheme of racially proportionate admissions.

I also join Parts I through VII of JUSTICE THOMAS's opinion.* I find particularly unanswerable his central point: that the allegedly "compelling state interest" at issue here is not the incremental "educational benefit" that emanates from the fabled "critical mass" of minority students, but rather Michigan's interest in maintaining a "prestige" law school whose normal admissions standards disproportionately exclude blacks and other minorities. If that is a compelling state interest, everything is.

I add the following: The "educational benefit" that the University of Michigan seeks to achieve by racial discrimination consists, according to the Court, of " 'cross-racial understanding,' " ante, at 330, and " 'better prepar[ation of] students for an increasingly diverse workforce and society,' " ibid., all of which is necessary not only for work, but also for good "citizenship," ante, at 331. This is not, of course, an "educational benefit" on which students will be graded on their law school transcript (Works and Plays Well with Others: B+) or tested by the bar examiners (Q: Describe in 500 words or less your cross-racial understanding). For it is a lesson of life rather than law—essentially the same lesson taught to (or rather learned by, for it cannot be "taught" in the usual sense) people three feet shorter and 20 years younger than the full-grown adults at the University of Michigan Law School, in institutions ranging from Boy Scout troops to public-school kindergartens. If properly considered an "educational benefit" at all, it is surely not one that is either uniquely relevant to law school or uniquely "teachable" in a formal educational setting. *And therefore:* If it is appropriate for the Univer-

---

*Part VII of JUSTICE THOMAS's opinion describes those portions of the Court's opinion in which I concur. See *post,* at 374–378 (opinion concurring in part and dissenting in part).

sity of Michigan Law School to use racial discrimination for the purpose of putting together a "critical mass" that will convey generic lessons in socialization and good citizenship, surely it is no less appropriate—indeed, *particularly* appropriate—for the civil service system of the State of Michigan to do so. There, also, those exposed to "critical masses" of certain races will presumably become better Americans, better Michiganders, better civil servants. And surely private employers cannot be criticized—indeed, should be praised—if they also "teach" good citizenship to their adult employees through a patriotic, all-American system of racial discrimination in hiring. The nonminority individuals who are deprived of a legal education, a civil service job, or any job at all by reason of their skin color will surely understand.

Unlike a clear constitutional holding that racial preferences in state educational institutions are impermissible, or even a clear anticonstitutional holding that racial preferences in state educational institutions are OK, today's *Grutter-Gratz* split double header seems perversely designed to prolong the controversy and the litigation. Some future lawsuits will presumably focus on whether the discriminatory scheme in question contains enough evaluation of the applicant "as an individual," *ante*, at 337, and sufficiently avoids "separate admissions tracks," *ante*, at 334, to fall under *Grutter* rather than *Gratz.* Some will focus on whether a university has gone beyond the bounds of a " 'good-faith effort' " and has so zealously pursued its "critical mass" as to make it an unconstitutional *de facto* quota system, rather than merely " 'a permissible goal.' " *Ante*, at 335 (quoting *Sheet Metal Workers* v. *EEOC*, 478 U. S. 421, 495 (1986) (O'CONNOR, J., concurring in part and dissenting in part)). Other lawsuits may focus on whether, in the particular setting at issue, any educational benefits flow from racial diversity. (That issue was not contested in *Grutter;* and while the opinion accords "a degree of deference to a university's academic decisions," *ante*, at 328, "deference does not imply

abandonment or abdication of judicial review," *Miller-El* v. *Cockrell,* 537 U. S. 322, 340 (2003).) Still other suits may challenge the bona fides of the institution's expressed commitment to the educational benefits of diversity that immunize the discriminatory scheme in *Grutter.* (Tempting targets, one would suppose, will be those universities that talk the talk of multiculturalism and racial diversity in the courts but walk the walk of tribalism and racial segregation on their campuses—through minority-only student organizations, separate minority housing opportunities, separate minority student centers, even separate minority-only graduation ceremonies.) And still other suits may claim that the institution's racial preferences have gone below or above the mystical *Grutter*-approved "critical mass." Finally, litigation can be expected on behalf of minority groups intentionally short changed in the institution's composition of its generic minority "critical mass." I do not look forward to any of these cases. The Constitution proscribes government discrimination on the basis of race, and state-provided education is no exception.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins as to Parts I–VII, concurring in part and dissenting in part.

Frederick Douglass, speaking to a group of abolitionists almost 140 years ago, delivered a message lost on today's majority:

> "[I]n regard to the colored people, there is always more that is benevolent, I perceive, than just, manifested towards us. What I ask for the negro is not benevolence, not pity, not sympathy, but simply *justice.* The American people have always been anxious to know what they shall do with us. . . . I have had but one answer from the beginning. Do nothing with us! Your doing with us has already played the mischief with us. Do nothing with us! If the apples will not remain on the tree of

their own strength, if they are worm-eaten at the core, if they are early ripe and disposed to fall, let them fall! . . . And if the negro cannot stand on his own legs, let him fall also. All I ask is, give him a chance to stand on his own legs! Let him alone! . . . [Y]our interference is doing him positive injury." What the Black Man Wants: An Address Delivered in Boston, Massachusetts, on 26 January 1865, reprinted in 4 The Frederick Douglass Papers 59, 68 (J. Blassingame & J. McKivigan eds. 1991) (emphasis in original).

Like Douglass, I believe blacks can achieve in every avenue of American life without the meddling of university administrators. Because I wish to see all students succeed whatever their color, I share, in some respect, the sympathies of those who sponsor the type of discrimination advanced by the University of Michigan Law School (Law School). The Constitution does not, however, tolerate institutional devotion to the status quo in admissions policies when such devotion ripens into racial discrimination. Nor does the Constitution countenance the unprecedented deference the Court gives to the Law School, an approach inconsistent with the very concept of "strict scrutiny."

No one would argue that a university could set up a lower general admissions standard and then impose heightened requirements only on black applicants. Similarly, a university may not maintain a high admissions standard and grant exemptions to favored races. The Law School, of its own choosing, and for its own purposes, maintains an exclusionary admissions system that it knows produces racially disproportionate results. Racial discrimination is not a permissible solution to the self-inflicted wounds of this elitist admissions policy.

The majority upholds the Law School's racial discrimination not by interpreting the people's Constitution, but by responding to a faddish slogan of the cognoscenti. Nevertheless, I concur in part in the Court's opinion. First, I agree with the Court insofar as its decision, which approves of only

one racial classification, confirms that further use of race in admissions remains unlawful. Second, I agree with the Court's holding that racial discrimination in higher education admissions will be illegal in 25 years. See *ante*, at 343 (stating that racial discrimination will no longer be narrowly tailored, or "necessary to further" a compelling state interest, in 25 years). I respectfully dissent from the remainder of the Court's opinion and the judgment, however, because I believe that the Law School's current use of race violates the Equal Protection Clause and that the Constitution means the same thing today as it will in 300 months.

## I

The majority agrees that the Law School's racial discrimination should be subjected to strict scrutiny. *Ante*, at 326. Before applying that standard to this case, I will briefly revisit the Court's treatment of racial classifications.

The strict scrutiny standard that the Court purports to apply in this case was first enunciated in *Korematsu* v. *United States*, 323 U. S. 214 (1944). There the Court held that "[p]ressing public necessity may sometimes justify the existence of [racial discrimination]; racial antagonism never can." *Id.*, at 216. This standard of "pressing public necessity" has more frequently been termed "compelling governmental interest,"[1] see, *e. g.*, *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 299 (1978) (opinion of Powell, J.). A majority of the Court has validated only two circumstances where "pressing public necessity" or a "compelling state interest" can possibly justify racial discrimination by state actors. First, the lesson of *Korematsu* is that national security constitutes a "pressing public necessity," though the government's use of race to advance that objective must be narrowly tailored. Second, the Court has recognized as a compelling state interest a government's effort to remedy

---

[1] Throughout I will use the two phrases interchangeably.

past discrimination for which it is responsible. *Richmond v. J. A. Croson Co.*, 488 U. S. 469, 504 (1989).

The contours of "pressing public necessity" can be further discerned from those interests the Court has rejected as bases for racial discrimination. For example, *Wygant v. Jackson Bd. of Ed.*, 476 U. S. 267 (1986), found unconstitutional a collective-bargaining agreement between a school board and a teachers' union that favored certain minority races. The school board defended the policy on the grounds that minority teachers provided "role models" for minority students and that a racially "diverse" faculty would improve the education of all students. See Brief for Respondents, O. T. 1984, No. 84–1340, pp. 27–28; 476 U. S., at 315 (STEVENS, J., dissenting) ("[A]n integrated faculty will be able to provide benefits to the student body that could not be provided by an all-white, or nearly all-white, faculty"). Nevertheless, the Court found that the use of race violated the Equal Protection Clause, deeming both asserted state interests insufficiently compelling. *Id.*, at 275–276 (plurality opinion); *id.*, at 295 (White, J., concurring in judgment) ("None of the interests asserted by the [school board] . . . justify this racially discriminatory layoff policy").[2]

An even greater governmental interest involves the sensitive role of courts in child custody determinations. In *Palmore v. Sidoti*, 466 U. S. 429 (1984), the Court held that even the best interests of a child did not constitute a compelling state interest that would allow a state court to award custody to the father because the mother was in a mixed-race marriage. *Id.*, at 433 (finding the interest "substantial" but

---

[2] The Court's refusal to address *Wygant*'s rejection of a state interest virtually indistinguishable from that presented by the Law School is perplexing. If the Court defers to the Law School's judgment that a racially mixed student body confers educational benefits to all, then why would the *Wygant* Court not defer to the school board's judgment with respect to the benefits a racially mixed faculty confers?

holding the custody decision could not be based on the race of the mother's new husband).

Finally, the Court has rejected an interest in remedying general societal discrimination as a justification for race discrimination. See *Wygant, supra,* at 276 (plurality opinion); *Croson,* 488 U. S., at 496–498 (plurality opinion); *id.,* at 520–521 (SCALIA, J., concurring in judgment). "Societal discrimination, without more, is too amorphous a basis for imposing a racially classified remedy" because a "court could uphold remedies that are ageless in their reach into the past, and timeless in their ability to affect the future." *Wygant, supra,* at 276 (plurality opinion). But see *Gratz* v. *Bollinger, ante,* p. 298 (GINSBURG, J., dissenting).

Where the Court has accepted only national security, and rejected even the best interests of a child, as a justification for racial discrimination, I conclude that only those measures the State must take to provide a bulwark against anarchy, or to prevent violence, will constitute a "pressing public necessity." Cf. *Lee* v. *Washington,* 390 U. S. 333, 334 (1968) *(per curiam)* (Black, J., concurring) (indicating that protecting prisoners from violence might justify narrowly tailored racial discrimination); *Croson, supra,* at 521 (SCALIA, J., concurring in judgment) ("At least where state or local action is at issue, only a social emergency rising to the level of imminent danger to life and limb . . . can justify [racial discrimination]").

The Constitution abhors classifications based on race, not only because those classifications can harm favored races or are based on illegitimate motives, but also because every time the government places citizens on racial registers and makes race relevant to the provision of burdens or benefits, it demeans us all. "Purchased at the price of immeasurable human suffering, the equal protection principle reflects our Nation's understanding that such classifications ultimately have a destructive impact on the individual and our society."

*Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 240 (1995)
(THOMAS, J., concurring in part and concurring in judgment).

## II

Unlike the majority, I seek to define with precision the interest being asserted by the Law School before determining whether that interest is so compelling as to justify racial discrimination. The Law School maintains that it wishes to obtain "educational benefits that flow from student body diversity," Brief for Respondent Bollinger et al. 14. This statement must be evaluated carefully, because it implies that both "diversity" and "educational benefits" are components of the Law School's compelling state interest. Additionally, the Law School's refusal to entertain certain changes in its admissions process and status indicates that the compelling state interest it seeks to validate is actually broader than might appear at first glance.

Undoubtedly there are other ways to "better" the education of law students aside from ensuring that the student body contains a "critical mass" of underrepresented minority students. Attaining "diversity," whatever it means,[3] is the

---

[3] "[D]iversity," for all of its devotees, is more a fashionable catchphrase than it is a useful term, especially when something as serious as racial discrimination is at issue. Because the Equal Protection Clause renders the color of one's skin constitutionally irrelevant to the Law School's mission, I refer to the Law School's interest as an "aesthetic." That is, the Law School wants to have a certain appearance, from the shape of the desks and tables in its classrooms to the color of the students sitting at them.

I also use the term "aesthetic" because I believe it underlines the ineffectiveness of racially discriminatory admissions in actually helping those who are truly underprivileged. Cf. *Orr* v. *Orr,* 440 U. S. 268, 283 (1979) (noting that suspect classifications are especially impermissible when "the choice made by the State appears to redound . . . to the benefit of those without need for special solicitude"). It must be remembered that the Law School's racial discrimination does nothing for those too poor or uneducated to participate in elite higher education and therefore presents only an illusory solution to the challenges facing our Nation.

mechanism by which the Law School obtains educational benefits, not an end of itself. The Law School, however, apparently believes that only a racially mixed student body can lead to the educational benefits it seeks. How, then, is the Law School's interest in these allegedly unique educational "benefits" *not* simply the forbidden interest in "racial balancing," *ante*, at 330, that the majority expressly rejects?

A distinction between these two ideas (unique educational benefits based on racial aesthetics and race for its own sake) is purely sophistic—so much so that the majority uses them interchangeably. Compare *ante*, at 328 ("[T]he Law School has a compelling interest in attaining a diverse student body"), with *ante*, at 333 (referring to the "compelling interest in securing the *educational benefits* of a diverse student body" (emphasis added)). The Law School's argument, as facile as it is, can only be understood in one way: Classroom aesthetics yields educational benefits, racially discriminatory admissions policies are required to achieve the right racial mix, and therefore the policies are required to achieve the educational benefits. It is the *educational benefits* that are the end, or allegedly compelling state interest, not "diversity." But see *ante*, at 332 (citing the need for "openness and integrity of the educational institutions that provide [legal] training" without reference to any consequential educational benefits).

One must also consider the Law School's refusal to entertain changes to its current admissions system that might produce the same educational benefits. The Law School adamantly disclaims any race-neutral alternative that would reduce "academic selectivity," which would in turn "require the Law School to become a very different institution, and to sacrifice a core part of its educational mission." Brief for Respondent Bollinger et al. 33–36. In other words, the Law School seeks to improve marginally the education it offers

without sacrificing too much of its exclusivity and elite status.[4]

The proffered interest that the majority vindicates today, then, is not simply "diversity." Instead the Court upholds the use of racial discrimination as a tool to advance the Law School's interest in offering a marginally superior education while maintaining an elite institution. Unless each constituent part of this state interest is of pressing public necessity, the Law School's use of race is unconstitutional. I find each of them to fall far short of this standard.

## III

### A

A close reading of the Court's opinion reveals that all of its legal work is done through one conclusory statement: The Law School has a "compelling interest in securing the educational benefits of a diverse student body." *Ante,* at 333. No serious effort is made to explain how these benefits fit with the state interests the Court has recognized (or rejected) as compelling, see Part I, *supra,* or to place any theoretical constraints on an enterprising court's desire to discover still more justifications for racial discrimination. In the absence of any explanation, one might expect the Court to fall back on the judicial policy of *stare decisis.* But the Court eschews even this weak defense of its holding, shunning an analysis of the extent to which Justice Powell's opinion in *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265 (1978),

---

[4] The Law School believes both that the educational benefits of a racially engineered student body are large and that adjusting its overall admissions standards to achieve the same racial mix would require it to sacrifice its elite status. If the Law School is correct that the educational benefits of "diversity" are so great, then achieving them by altering admissions standards should not compromise its elite status. The Law School's reluctance to do this suggests that the educational benefits it alleges are not significant or do not exist at all.

is binding, *ante,* at 325, in favor of an unfounded wholesale adoption of it.

Justice Powell's opinion in *Bakke* and the Court's decision today rest on the fundamentally flawed proposition that racial discrimination can be contextualized so that a goal, such as classroom aesthetics, can be compelling in one context but not in another. This "we know it when we see it" approach to evaluating state interests is not capable of judicial application. Today, the Court insists on radically expanding the range of permissible uses of race to something as trivial (by comparison) as the assembling of a law school class. I can only presume that the majority's failure to justify its decision by reference to any principle arises from the absence of any such principle. See Part VI, *infra.*

### B

Under the proper standard, there is no pressing public necessity in maintaining a public law school at all and, it follows, certainly not an elite law school. Likewise, marginal improvements in legal education do not qualify as a compelling state interest.

### 1

While legal education at a public university may be good policy or otherwise laudable, it is obviously not a pressing public necessity when the correct legal standard is applied. Additionally, circumstantial evidence as to whether a state activity is of pressing public necessity can be obtained by asking whether all States feel compelled to engage in that activity. Evidence that States, in general, engage in a certain activity by no means demonstrates that the activity constitutes a pressing public necessity, given the expansive role of government in today's society. The fact that some fraction of the States reject a particular enterprise, however, creates a presumption that the enterprise itself is not a compelling state interest. In this sense, the absence of a public, American Bar Association (ABA) accredited, law school in

Alaska, Delaware, Massachusetts, New Hampshire, and Rhode Island, see ABA–LSAC Official Guide to ABA-Approved Law Schools (W. Margolis, B. Gordon, J. Puskarz, & D. Rosenlieb eds. 2004) (hereinafter ABA–LSAC Guide), provides further evidence that Michigan's maintenance of the Law School does not constitute a compelling state interest.

### 2

As the foregoing makes clear, Michigan has no compelling interest in having a law school at all, much less an *elite* one. Still, even assuming that a State may, under appropriate circumstances, demonstrate a cognizable interest in having an elite law school, Michigan has failed to do so here.

This Court has limited the scope of equal protection review to interests and activities that occur within that State's jurisdiction. The Court held in *Missouri ex rel. Gaines* v. *Canada*, 305 U. S. 337 (1938), that Missouri could not satisfy the demands of "separate but equal" by paying for legal training of blacks at neighboring state law schools, while maintaining a segregated law school within the State. The equal protection

> "obligation is imposed by the Constitution upon the States severally as governmental entities,—each responsible for its own laws establishing the rights and duties of persons within its borders. It is an obligation the burden of which cannot be cast by one State upon another, and no State can be excused from performance *by what another State may do or fail to do.* That separate responsibility of each State within its own sphere is of the essence of statehood maintained under our dual system." *Id.,* at 350 (emphasis added).

The Equal Protection Clause, as interpreted by the Court in *Gaines*, does not permit States to justify racial discrimination on the basis of what the rest of the Nation "may do or fail to do." The only interests that can satisfy the Equal

Protection Clause's demands are those found within a State's jurisdiction.

The only cognizable state interests vindicated by operating a public law school are, therefore, the education of that State's citizens and the training of that State's lawyers. James Campbell's address at the opening of the Law Department at the University of Michigan on October 3, 1859, makes this clear:

> "It not only concerns *the State* that every one should have all reasonable facilities for preparing himself for any honest position in life to which he may aspire, but it also concerns *the community* that the Law should be taught and understood. . . . There is not an office *in the State* in which serious legal inquiries may not frequently arise. . . . In all these matters, public and private rights are constantly involved and discussed, and ignorance of the Law has frequently led to results deplorable and alarming. . . . [I]n the history of *this State,* in more than one instance, that ignorance has led to unlawful violence, and the shedding of innocent blood."  E. Brown, Legal Education at Michigan 1859–1959, pp. 404–406 (1959) (emphasis added).

The Law School today, however, does precious little training of those attorneys who will serve the citizens of Michigan.  In 2002, graduates of the Law School made up less than 6% of applicants to the Michigan bar, Michigan Lawyers Weekly, available at http://www.michiganlawyersweekly.com/barpassers0202.cfm,barpassers0702 .cfm (all Internet materials as visited June 13, 2003, and available in Clerk of Court's case file), even though the Law School's graduates constitute nearly 30% of all law students graduating in Michigan. *Ibid.*  Less than 16% of the Law School's graduating class elects to stay in Michigan after law school.  ABA–LSAC Guide 427.  Thus, while a mere 27% of the Law School's 2002 entering class is from Michigan, see University of

Michigan Law School Website, available at http://www.law. umich.edu/prospectivestudents/Admissions/index.htm, only half of these, it appears, will stay in Michigan.

In sum, the Law School trains few Michigan residents and overwhelmingly serves students, who, as lawyers, leave the State of Michigan. By contrast, Michigan's other public law school, Wayne State University Law School, sends 88% of its graduates on to serve the people of Michigan. ABA–LSAC Guide 775. It does not take a social scientist to conclude that it is precisely the Law School's status as an elite institution that causes it to be a waystation for the rest of the country's lawyers, rather than a training ground for those who will remain in Michigan. The Law School's decision to be an elite institution does little to advance the welfare of the people of Michigan or any cognizable interest of the State of Michigan.

Again, the fact that few States choose to maintain elite law schools raises a strong inference that there is nothing compelling about elite status. Arguably, only the public law schools of the University of Texas, the University of California, Berkeley (Boalt Hall), and the University of Virginia maintain the same reputation for excellence as the Law School.[5] Two of these States, Texas and California, are so large that they could reasonably be expected to provide elite legal training at a separate law school to students who will, in fact, stay in the State and provide legal services to its citizens. And these two schools far outshine the Law School in producing in-state lawyers. The University of Texas, for example, sends over three-fourths of its graduates on to work in the State of Texas, vindicating the State's interest (compelling or not) in training Texas' lawyers. *Id.*, at 691.

---

[5] Cf. U. S. News & World Report, America's Best Graduate Schools 28 (2004 ed.) (placing these schools in the uppermost 15 in the Nation).

### 3

Finally, even if the Law School's racial tinkering produces tangible educational benefits, a marginal improvement in legal education cannot justify racial discrimination where the Law School has no compelling interest either in its existence or in its current educational and admissions policies.

### IV

The interest in remaining elite and exclusive that the majority thinks so obviously critical requires the use of admissions "standards" that, in turn, create the Law School's "need" to discriminate on the basis of race. The Court validates these admissions standards by concluding that alternatives that would require "a dramatic sacrifice of . . . the academic quality of all admitted students," *ante,* at 340, need not be considered before racial discrimination can be employed.[6] In the majority's view, such methods are not required by the "narrow tailoring" prong of strict scrutiny because that inquiry demands, in this context, that any race-neutral alternative work "'about as well.'" *Ante,* at 339 (quoting *Wygant,* 476 U. S., at 280, n. 6). The majority errs, however, because race-neutral alternatives must only be "workable," *ante,* at 339, and do "about as well" *in vindicating the compelling state interest.* The Court never explicitly holds that the Law School's desire to retain the status quo in "academic selectivity" is itself a compelling state interest, and, as I have demonstrated, it is not. See Part III–B, *supra.* Therefore, the Law School should be forced to choose between its classroom aesthetic and its exclusionary admissions system—it cannot have it both ways.

With the adoption of different admissions methods, such as accepting all students who meet minimum qualifications,

---

[6] The Court refers to this component of the Law School's compelling state interest variously as "academic quality," avoiding "sacrifice [of] a vital component of its educational mission," and "academic selectivity." *Ante,* at 340.

see Brief for United States as *Amicus Curiae* 13–14, the Law School could achieve its vision of the racially aesthetic student body without the use of racial discrimination. The Law School concedes this, but the Court holds, implicitly and under the guise of narrow tailoring, that the Law School has a compelling state interest in doing what it wants to do. I cannot agree. First, under strict scrutiny, the Law School's assessment of the benefits of racial discrimination and devotion to the admissions status quo are not entitled to any sort of deference, grounded in the First Amendment or anywhere else. Second, even if its "academic selectivity" must be maintained at all costs along with racial discrimination, the Court ignores the fact that other top law schools have succeeded in meeting their aesthetic demands without racial discrimination.

### A

The Court bases its unprecedented deference to the Law School—a deference antithetical to strict scrutiny—on an idea of "educational autonomy" grounded in the First Amendment. *Ante,* at 329. In my view, there is no basis for a right of public universities to do what would otherwise violate the Equal Protection Clause.

The constitutionalization of "academic freedom" began with the concurring opinion of Justice Frankfurter in *Sweezy* v. *New Hampshire,* 354 U. S. 234 (1957). Sweezy, a Marxist economist, was investigated by the Attorney General of New Hampshire on suspicion of being a subversive. The prosecution sought, *inter alia,* the contents of a lecture Sweezy had given at the University of New Hampshire. The Court held that the investigation violated due process. *Id.,* at 254.

Justice Frankfurter went further, however, reasoning that the First Amendment created a right of academic freedom that prohibited the investigation. *Id.,* at 256–267 (opinion concurring in result). Much of the rhetoric in Justice Frankfurter's opinion was devoted to the personal right of Sweezy to free speech. See, *e. g., id.,* at 265 ("For a citizen to be

made to forego even a part of so basic a liberty as his political autonomy, the subordinating interest of the State must be compelling"). Still, claiming that the United States Reports "need not be burdened with proof," Justice Frankfurter also asserted that a "free society" depends on "free universities" and "[t]his means the exclusion of governmental intervention in the intellectual life of a university." *Id.*, at 262. According to Justice Frankfurter: "It is the business of a university to provide that atmosphere which is most conducive to speculation, experiment and creation. It is an atmosphere in which there prevail 'the four essential freedoms' of a university—to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Id.*, at 263 (citation omitted).

In my view, "[i]t is the business" of this Court to explain itself when it cites provisions of the Constitution to invent new doctrines—including the idea that the First Amendment authorizes a public university to do what would otherwise violate the Equal Protection Clause. The majority fails in its summary effort to prove this point. The only source for the Court's conclusion that public universities are entitled to deference even within the confines of strict scrutiny is Justice Powell's opinion in *Bakke*. Justice Powell, for his part, relied only on Justice Frankfurter's opinion in *Sweezy* and the Court's decision in *Keyishian* v. *Board of Regents of Univ. of State of N. Y.*, 385 U. S. 589 (1967), to support his view that the First Amendment somehow protected a public university's use of race in admissions. *Bakke*, 438 U. S., at 312. *Keyishian* provides no answer to the question whether the Fourteenth Amendment's restrictions are relaxed when applied to public universities. In that case, the Court held that state statutes and regulations designed to prevent the "appointment or retention of 'subversive' persons in state employment," 385 U. S., at 592, violated the First Amendment for vagueness. The statutes covered all public employees and were not invalidated only as applied to uni-

versity faculty members, although the Court appeared sympathetic to the notion of academic freedom, calling it a "special concern of the First Amendment." *Id.*, at 603. Again, however, the Court did not relax any independent constitutional restrictions on public universities.

I doubt that when Justice Frankfurter spoke of governmental intrusions into the independence of universities, he was thinking of the Constitution's ban on racial discrimination. The majority's broad deference to both the Law School's judgment that racial aesthetics leads to educational benefits and its stubborn refusal to alter the status quo in admissions methods finds no basis in the Constitution or decisions of this Court.

## B

### 1

The Court's deference to the Law School's conclusion that its racial experimentation leads to educational benefits will, if adhered to, have serious collateral consequences. The Court relies heavily on social science evidence to justify its deference. See *ante*, at 330–332; but see also Rothman, Lipset, & Nevitte, Racial Diversity Reconsidered, 151 Public Interest 25 (2003) (finding that the racial mix of a student body produced by racial discrimination of the type practiced by the Law School in fact hinders students' perception of academic quality). The Court never acknowledges, however, the growing evidence that racial (and other sorts) of heterogeneity actually impairs learning among black students. See, *e. g.*, Flowers & Pascarella, Cognitive Effects of College Racial Composition on African American Students After 3 Years of College, 40 J. of College Student Development 669, 674 (1999) (concluding that black students experience superior cognitive development at Historically Black Colleges (HBCs) and that, even among blacks, "a substantial diversity moderates the cognitive effects of attending an HBC"); Allen, The Color of Success: African-American College Stu-

dent Outcomes at Predominantly White and Historically Black Public Colleges and Universities, 62 Harv. Educ. Rev. 26, 35 (1992) (finding that black students attending HBCs report higher academic achievement than those attending predominantly white colleges).

At oral argument in *Gratz* v. *Bollinger, ante,* p. 244, counsel for respondents stated that "most every single one of [the HBCs] do have diverse student bodies." Tr. of Oral Arg. in No. 02–516, p. 52. What precisely counsel meant by "diverse" is indeterminate, but it is reported that in 2000 at Morehouse College, one of the most distinguished HBCs in the Nation, only 0.1% of the student body was white, and only 0.2% was Hispanic. College Admissions Data Handbook 2002–2003, p. 613 (43d ed. 2002) (hereinafter College Admissions Data Handbook). And at Mississippi Valley State University, a public HBC, only 1.1% of the freshman class in 2001 was white. *Id.,* at 603. If there is a "critical mass" of whites at these institutions, then "critical mass" is indeed a very small proportion.

The majority grants deference to the Law School's "assessment that diversity will, in fact, yield educational benefits," *ante,* at 328. It follows, therefore, that an HBC's assessment that racial homogeneity will yield educational benefits would similarly be given deference.[7] An HBC's rejection of white applicants in order to maintain racial homogeneity seems permissible, therefore, under the majority's view of the Equal Protection Clause. But see *United States* v. *Fordice,* 505 U. S. 717, 748 (1992) (THOMAS, J., concurring) ("Obviously, a State cannot maintain . . . traditions by closing particular institutions, historically white or historically black, to particular racial groups"). Contained within today's majority opinion is the seed of a new constitutional

---

[7] For example, North Carolina A&T State University, which is currently 5.4% white, College Admissions Data Handbook 643, could seek to reduce the representation of whites in order to gain additional educational benefits.

justification for a concept I thought long and rightly rejected—racial segregation.

2

Moreover one would think, in light of the Court's decision in *United States* v. *Virginia*, 518 U. S. 515 (1996), that before being given license to use racial discrimination, the Law School would be required to radically reshape its admissions process, even to the point of sacrificing some elements of its character. In *Virginia*, a majority of the Court, without a word about academic freedom, accepted the all-male Virginia Military Institute's (VMI) representation that some changes in its "adversative" method of education would be required with the admission of women, *id.*, at 540, but did not defer to VMI's judgment that these changes would be too great. Instead, the Court concluded that they were "manageable." *Id.*, at 551, n. 19. That case involved sex discrimination, which is subjected to intermediate, not strict, scrutiny. *Id.*, at 533; *Craig* v. *Boren*, 429 U. S. 190, 197 (1976). So in *Virginia*, where the standard of review dictated that greater flexibility be granted to VMI's educational policies than the Law School deserves here, this Court gave no deference. Apparently where the status quo being defended is that of the elite establishment—here the Law School—rather than a less fashionable Southern military institution, the Court will defer without serious inquiry and without regard to the applicable legal standard.

C

*Virginia* is also notable for the fact that the Court relied on the "experience" of formerly single-sex institutions, such as the service academies, to conclude that admission of women to VMI would be "manageable." 518 U. S., at 544–545. Today, however, the majority ignores the "experience" of those institutions that have been forced to abandon explicit racial discrimination in admissions.

. The sky has not fallen at Boalt Hall at the University of California, Berkeley, for example. Prior to Proposition 209's adoption of Cal. Const., Art. 1, § 31(a), which bars the State from "grant[ing] preferential treatment . . . on the basis of race . . . in the operation of . . . public education,"[8] Boalt Hall enrolled 20 blacks and 28 Hispanics in its first-year class for 1996. In 2002, without deploying express racial discrimination in admissions, Boalt's entering class enrolled 14 blacks and 36 Hispanics.[9] University of California Law and Medical School Enrollments, available at http://www.ucop.edu/ acadadv/datamgmt/lawmed/law-enrolls-eth2.html. Total underrepresented minority student enrollment at Boalt Hall now exceeds 1996 levels. Apparently the Law School cannot be counted on to be as resourceful. The Court is willfully blind to the very real experience in California and elsewhere, which raises the inference that institutions with "reputation[s] for excellence," *ante,* at 339, rivaling the Law School's have satisfied their sense of mission without resorting to prohibited racial discrimination.

## V

Putting aside the absence of any legal support for the majority's reflexive deference, there is much to be said for the view that the use of tests and other measures to "predict" academic performance is a poor substitute for a system that gives every applicant a chance to prove he can succeed in the study of law. The rallying cry that in the absence of racial discrimination in admissions there would be a true

---

[8] Cal. Const., Art. 1, § 31(a), states in full:

"The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." See *Coalition for Economic Equity* v. *Wilson,* 122 F. 3d 692 (CA9 1997).

[9] Given the incredible deference the Law School receives from the Court, I think it appropriate to indulge in the presumption that Boalt Hall operates without violating California law.

meritocracy ignores the fact that the entire process is poisoned by numerous exceptions to "merit." For example, in the national debate on racial discrimination in higher education admissions, much has been made of the fact that elite institutions utilize a so-called "legacy" preference to give the children of alumni an advantage in admissions. This, and other, exceptions to a "true" meritocracy give the lie to protestations that merit admissions are in fact the order of the day at the Nation's universities. The Equal Protection Clause does not, however, prohibit the use of unseemly legacy preferences or many other kinds of arbitrary admissions procedures. What the Equal Protection Clause does prohibit are classifications made on the basis of race. So while legacy preferences can stand under the Constitution, racial discrimination cannot.[10] I will not twist the Constitution to invalidate legacy preferences or otherwise impose my vision of higher education admissions on the Nation. The majority should similarly stay its impulse to validate faddish racial discrimination the Constitution clearly forbids.

In any event, there is nothing ancient, honorable, or constitutionally protected about "selective" admissions. The University of Michigan should be well aware that alternative methods have historically been used for the admission of students, for it brought to this country the German certificate system in the late-19th century. See H. Wechsler, The Qualified Student 16–39 (1977) (hereinafter Qualified Student). Under this system, a secondary school was certified by a university so that any graduate who completed the course offered by the school was offered admission to the university. The certification regime supplemented, and later virtually replaced (at least in the Midwest), the prior regime of rigor-

---

[10] Were this Court to have the courage to forbid the use of racial discrimination in admissions, legacy preferences (and similar practices) might quickly become less popular—a possibility not lost, I am certain, on the elites (both individual and institutional) supporting the Law School in this case.

ous subject-matter entrance examinations. *Id.*, at 57–58. The facially race-neutral "percent plans" now used in Texas, California, and Florida, see *ante*, at 340, are in many ways the descendents of the certificate system.

Certification was replaced by selective admissions in the beginning of the 20th century, as universities sought to exercise more control over the composition of their student bodies. Since its inception, selective admissions has been the vehicle for racial, ethnic, and religious tinkering and experimentation by university administrators. The initial driving force for the relocation of the selective function from the high school to the universities was the same desire to select racial winners and losers that the Law School exhibits today. Columbia, Harvard, and others infamously determined that they had "too many" Jews, just as today the Law School argues it would have "too many" whites if it could not discriminate in its admissions process. See Qualified Student 155–168 (Columbia); H. Broun & G. Britt, Christians Only: A Study in Prejudice 53–54 (1931) (Harvard).

Columbia employed intelligence tests precisely because Jewish applicants, who were predominantly immigrants, scored worse on such tests. Thus, Columbia could claim (falsely) that "'[w]e have not eliminated boys because they were Jews and do not propose to do so. We have honestly attempted to eliminate the lowest grade of applicant [through the use of intelligence testing] and it turns out that a good many of the low grade men are New York City Jews.'" Letter from Herbert E. Hawkes, dean of Columbia College, to E. B. Wilson, June 16, 1922 (reprinted in Qualified Student 160–161). In other words, the tests were adopted with full knowledge of their disparate impact. Cf. *DeFunis* v. *Odegaard*, 416 U. S. 312, 335 (1974) *(per curiam)* (Douglas, J., dissenting).

Similarly no modern law school can claim ignorance of the poor performance of blacks, relatively speaking, on the Law School Admission Test (LSAT). Nevertheless, law schools

continue to use the test and then attempt to "correct" for black underperformance by using racial discrimination in admissions so as to obtain their aesthetic student body. The Law School's continued adherence to measures it knows produce racially skewed results is not entitled to deference by this Court. See Part IV, *supra.* The Law School itself admits that the test is imperfect, as it must, given that it regularly admits students who score at or below 150 (the national median) on the test. See App. 156–203 (showing that, between 1995 and 2000, the Law School admitted 37 students—27 of whom were black; 31 of whom were "underrepresented minorities"—with LSAT scores of 150 or lower). And the Law School's *amici* cannot seem to agree on the fundamental question whether the test itself is useful. Compare Brief for Law School Admission Council as *Amicus Curiae* 12 ("LSAT scores . . . are an effective predictor of students' performance in law school") with Brief for Harvard Black Law Students Association et al. as *Amici Curiae* 27 ("Whether [the LSAT] measure[s] objective merit . . . is certainly questionable").

Having decided to use the LSAT, the Law School must accept the constitutional burdens that come with this decision. The Law School may freely continue to employ the LSAT and other allegedly merit-based standards in whatever fashion it likes. What the Equal Protection Clause forbids, but the Court today allows, is the use of these standards hand-in-hand with racial discrimination. An infinite variety of admissions methods are available to the Law School. Considering all of the radical thinking that has historically occurred at this country's universities, the Law School's intractable approach toward admissions is striking.

The Court will not even deign to make the Law School try other methods, however, preferring instead to grant a 25-year license to violate the Constitution. And the same Court that had the courage to order the desegregation of all public schools in the South now fears, on the basis of plati-

tudes rather than principle, to force the Law School to abandon a decidedly imperfect admissions regime that provides the basis for racial discrimination.

## VI

The absence of any articulated legal principle supporting the majority's principal holding suggests another rationale. I believe what lies beneath the Court's decision today are the benighted notions that one can tell when racial discrimination benefits (rather than hurts) minority groups, see *Adarand*, 515 U. S., at 239 (SCALIA, J., concurring in part and concurring in judgment), and that racial discrimination is necessary to remedy general societal ills.  This Court's precedents supposedly settled both issues, but clearly the majority still cannot commit to the principle that racial classifications are *per se* harmful and that almost no amount of benefit in the eye of the beholder can justify such classifications.

Putting aside what I take to be the Court's implicit rejection of *Adarand*'s holding that beneficial and burdensome racial classifications are equally invalid, I must contest the notion that the Law School's discrimination benefits those admitted as a result of it.  The Court spends considerable time discussing the impressive display of *amicus* support for the Law School in this case from all corners of society. *Ante*, at 330–331.  But nowhere in any of the filings in this Court is any evidence that the purported "beneficiaries" of this racial discrimination prove themselves by performing at (or even near) the same level as those students who receive no preferences.  Cf. Thernstrom & Thernstrom, Reflections on the Shape of the River, 46 UCLA L. Rev. 1583, 1605–1608 (1999) (discussing the failure of defenders of racial discrimination in admissions to consider the fact that its "beneficiaries" are underperforming in the classroom).

The silence in this case is deafening to those of us who view higher education's purpose as imparting knowledge and skills to students, rather than a communal, rubber-stamp,

credentialing process. The Law School is not looking for those students who, despite a lower LSAT score or undergraduate grade point average, will succeed in the study of law. The Law School seeks only a facade—it is sufficient that the class looks right, even if it does not perform right.

The Law School tantalizes unprepared students with the promise of a University of Michigan degree and all of the opportunities that it offers. These overmatched students take the bait, only to find that they cannot succeed in the cauldron of competition. And this mismatch crisis is not restricted to elite institutions. See T. Sowell, Race and Culture 176–177 (1994) ("Even if most minority students are able to meet the normal standards at the 'average' range of colleges and universities, the systematic mismatching of minority students begun at the top can mean that such students are generally overmatched throughout all levels of higher education"). Indeed, to cover the tracks of the aestheticists, this cruel farce of racial discrimination must continue—in selection for the Michigan Law Review, see University of Michigan Law School Student Handbook 2002–2003, pp. 39–40 (noting the presence of a "diversity plan" for admission to the review), and in hiring at law firms and for judicial clerkships—until the "beneficiaries" are no longer tolerated. While these students may graduate with law degrees, there is no evidence that they have received a qualitatively better legal education (or become better lawyers) than if they had gone to a less "elite" law school for which they were better prepared. And the aestheticists will never address the real problems facing "underrepresented minorities,"[11] instead continuing their social experiments on other people's children.

---

[11] For example, there is no recognition by the Law School in this case that even with their racial discrimination in place, black *men* are "underrepresented" at the Law School. See ABA–LSAC Guide 426 (reporting that the Law School has 46 black women and 28 black men). Why does the Law School not also discriminate in favor of black men over black

Beyond the harm the Law School's racial discrimination visits. upon its test subjects, no social science has disproved the notion that this discrimination "engender[s] attitudes of superiority or, alternatively, provoke[s] resentment among those who believe that they have been wronged by the government's use of race." *Adarand*, 515 U. S., at 241 (THOMAS, J., concurring in part and concurring in judgment). "These programs stamp minorities with a badge of inferiority and may cause them to develop dependencies or to adopt an attitude that they are 'entitled' to preferences." *Ibid.*

It is uncontested that each year, the Law School admits a handful of blacks who would be admitted in the absence of racial discrimination. See Brief for Respondent Bollinger et al. 6. Who can differentiate between those who belong and those who do not? The majority of blacks are admitted to the Law School because of discrimination, and because of this policy all are tarred as undeserving. This problem of stigma does not depend on determinacy as to whether those stigmatized are actually the "beneficiaries" of racial discrimination. When blacks take positions in the highest places of government, industry, or academia, it is an open question today whether their skin color played a part in their advancement. The question itself is the stigma—because either racial discrimination did play a role, in which case the person may be deemed "otherwise unqualified," or it did not, in which case asking the question itself unfairly marks those blacks who would succeed without discrimination. Is this what the Court means by "visibly open"? *Ante*, at 332.

Finally, the Court's disturbing reference to the importance of the country's law schools as training grounds meant to cultivate "a set of leaders with legitimacy in the eyes of the citizenry," *ibid.*, through the use of racial discrimination deserves discussion. As noted earlier, the Court has soundly

women, given this underrepresentation? The answer is, again, that all the Law School cares about is its own image among know-it-all elites, not solving real problems like the crisis of black male underperformance.

rejected the remedying of societal discrimination as a justification for governmental use of race. *Wygant,* 476 U. S., at 276 (plurality opinion); *Croson,* 488 U. S., at 497 (plurality opinion); *id.,* at 520–521 (SCALIA, J., concurring in judgment). For those who believe that every racial disproportionality in our society is caused by some kind of racial discrimination, there can be no distinction between remedying societal discrimination and erasing racial disproportionalities in the country's leadership caste. And if the lack of proportional racial representation among our leaders is not caused by societal discrimination, then "fixing" it is even less of a pressing public necessity.

The Court's civics lesson presents yet another example of judicial selection of a theory of political representation based on skin color—an endeavor I have previously rejected. See *Holder* v. *Hall,* 512 U. S. 874, 899 (1994) (THOMAS, J., concurring in judgment). The majority appears to believe that broader utopian goals justify the Law School's use of race, but "[t]he Equal Protection Clause commands the elimination of racial barriers, not their creation in order to satisfy our theory as to how society ought to be organized." *DeFunis,* 416 U. S., at 342 (Douglas, J., dissenting).

## VII

As the foregoing makes clear, I believe the Court's opinion to be, in most respects, erroneous. I do, however, find two points on which I agree.

### A

First, I note that the issue of unconstitutional racial discrimination among the groups the Law School prefers is not presented in this case, because petitioner has never argued that the Law School engages in such a practice, and the Law School maintains that it does not. See Brief for Respondent Bollinger et al. 32, n. 50, and 6–7, n. 7. I join the Court's opinion insofar as it confirms that this type of racial discrimination remains unlawful. *Ante,* at 326–327. Under today's

decision, it is still the case that racial discrimination that does not help a university to enroll an unspecified number, or "critical mass," of underrepresented minority students is unconstitutional. Thus, the Law School may not discriminate in admissions between similarly situated blacks and Hispanics, or between whites and Asians. This is so because preferring black to Hispanic applicants, for instance, does nothing to further the interest recognized by the majority today.[12] Indeed, the majority describes such racial balancing as "patently unconstitutional." *Ante*, at 330. Like the Court, *ante*, at 336, I express no opinion as to whether the Law School's current admissions program runs afoul of this prohibition.

B

The Court also holds that racial discrimination in admissions should be given another 25 years before it is deemed no longer narrowly tailored to the Law School's fabricated compelling state interest. *Ante*, at 343. While I agree that in 25 years the practices of the Law School will be illegal, they are, for the reasons I have given, illegal now. The majority does not and cannot rest its time limitation on any evidence that the gap in credentials between black and white

---

[12] That interest depends on enrolling a "critical mass" of underrepresented minority students, as the majority repeatedly states. *Ante*, at 316, 318, 319, 330, 333, 335, 340; cf. *ante*, at 333 (referring to the unique experience of being a "racial minority," as opposed to being black, or Native American); *ante*, at 335–336 (rejecting argument that the Law School maintains a disguised quota by referring to the total number of enrolled underrepresented minority students, not specific races). As it relates to the Law School's racial discrimination, the Court clearly approves of only one use of race—the distinction between underrepresented minority applicants and those of all other races. A relative preference awarded to a black applicant over, for example, a similarly situated Native American applicant, does not lead to the enrollment of even one more underrepresented minority student, but only balances the races within the "critical mass."

students is shrinking or will be gone in that timeframe.[13]   In recent years there has been virtually no change, for example, in the proportion of law school applicants with LSAT scores of 165 and higher who are black.[14]   In 1993 blacks constituted 1.1% of law school applicants in that score range, though they represented 11.1% of all applicants.   Law School Admission Council, National Statistical Report (1994) (hereinafter LSAC Statistical Report).   In 2000 the comparable numbers were 1.0% and 11.3%.   LSAC Statistical Report (2001).   No one can seriously contend, and the Court does not, that the racial gap in academic credentials will disappear in 25 years.   Nor is the Court's holding that racial discrimination will be unconstitutional in 25 years made contingent on the gap closing in that time.[15]

---

[13] I agree with JUSTICE GINSBURG that the Court's holding that racial discrimination in admissions will be illegal in 25 years is not based upon a "forecast," *post*, at 346 (concurring opinion).   I do not agree with JUSTICE GINSBURG's characterization of the Court's holding as an expression of "hope." *Ibid.*

[14] I use a score of 165 as the benchmark here because the Law School feels it is the relevant score range for applicant consideration (absent race discrimination).   See Brief for Respondent Bollinger et al. 5; App. to Pet. for Cert. 309a (showing that the median LSAT score for all accepted applicants from 1995–1998 was 168); *id.*, at 310a–311a (showing the median LSAT score for accepted applicants was 167 for the years 1999 and 2000); University of Michigan Law School Website, available at http://www.law.umich.edu/prospectivestudents/Admissions/index.htm (showing that the median LSAT score for accepted applicants in 2002 was 166).

[15] The majority's non sequitur observation that since 1978 the number of blacks that have scored in these upper ranges on the LSAT has grown, *ante*, at 343, says nothing about current trends.   First, black participation in the LSAT until the early 1990's lagged behind black representation in the general population.   For instance, in 1984 only 7.3% of law school applicants were black, whereas in 2000 11.3% of law school applicants were black.   See LSAC Statistical Reports (1984 and 2000).   Today, however, unless blacks were to begin applying to law school in proportions greater than their representation in the general population, the growth in absolute numbers of high scoring blacks should be expected to plateau, and it has.

Indeed, the very existence of racial discrimination of the type practiced by the Law School may impede the narrowing of the LSAT testing gap. An applicant's LSAT score can improve dramatically with preparation, but such preparation is a cost, and there must be sufficient benefits attached to an improved score to justify additional study. Whites scoring between 163 and 167 on the LSAT are routinely rejected by the Law School, and thus whites aspiring to admission at the Law School have every incentive to improve their score to levels above that range. See App. 199 (showing that in 2000, 209 out of 422 white applicants were rejected in this scoring range). Blacks, on the other hand, are nearly guaranteed admission if they score above 155. Id., at 198 (showing that 63 out of 77 black applicants are accepted with LSAT scores above 155). As admission prospects approach certainty, there is no incentive for the black applicant to continue to prepare for the LSAT once he is reasonably assured of achieving the requisite score. It is far from certain that the LSAT test-taker's behavior is responsive to the Law School's admissions policies.[16] Nevertheless, the possibility remains that this racial discrimination will help fulfill the bigot's prophecy about black underperformance—just as it confirms the conspiracy theorist's belief that "institutional racism" is at fault for every racial disparity in our society.

I therefore can understand the imposition of a 25-year time limit only as a holding that the deference the Court pays to the Law School's educational judgments and refusal to change its admissions policies will itself expire. At that point these policies will clearly have failed to " 'eliminat[e]

In 1992, 63 black applicants to law school had LSAT scores above 165. In 2000, that number was 65. See LSAC Statistical Reports (1992 and 2000).

[16] I use the LSAT as an example, but the same incentive structure is in place for any admissions criteria, including undergraduate grades, on which minorities are consistently admitted at thresholds significantly lower than whites.

the [perceived] need for any racial or ethnic'" discrimination because the academic credentials gap will still be there. *Ante,* at 343 (quoting Nathanson & Bartnik, The Constitutionality of Preferential Treatment for Minority Applicants to Professional Schools, 58 Chicago Bar Rec. 282, 293 (May–June 1977)). The Court defines this time limit in terms of narrow tailoring, see *ante,* at 343, but I believe this arises from its refusal to define rigorously the broad state interest vindicated today. Cf. Part II, *supra.* With these observations, I join the last sentence of Part III of the opinion of the Court.

\*        \*        \*

For the immediate future, however, the majority has placed its *imprimatur* on a practice that can only weaken the principle of equality embodied in the Declaration of Independence and the Equal Protection Clause. "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy* v. *Ferguson,* 163 U. S. 537, 559 (1896) (Harlan, J., dissenting). It has been nearly 140 years since Frederick Douglass asked the intellectual ancestors of the Law School to "[d]o nothing with us!" and the Nation adopted the Fourteenth Amendment. Now we must wait another 25 years to see this principle of equality vindicated. I therefore respectfully dissent from the remainder of the Court's opinion and the judgment.

CHIEF JUSTICE REHNQUIST, with whom JUSTICE SCALIA, JUSTICE KENNEDY, and JUSTICE THOMAS join, dissenting.

I agree with the Court that, "in the limited circumstance when drawing racial distinctions is permissible," the government must ensure that its means are narrowly tailored to achieve a compelling state interest. *Ante,* at 333; see also *Fullilove* v. *Klutznick,* 448 U. S. 448, 498 (1980) (Powell, J., concurring) ("[E]ven if the government proffers a compelling interest to support reliance upon a suspect classification, the means selected must be narrowly drawn to fulfill the govern-

mental purpose"). I do not believe, however, that the University of Michigan Law School's (Law School) means are narrowly tailored to the interest it asserts. The Law School claims it must take the steps it does to achieve a " 'critical mass' " of underrepresented minority students. Brief for Respondent Bollinger et al. 13. But its actual program bears no relation to this asserted goal. Stripped of its "critical mass" veil, the Law School's program is revealed as a naked effort to achieve racial balancing.

As we have explained many times, " ' "[a]ny preference based on racial or ethnic criteria must necessarily receive a most searching examination." ' " *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 223 (1995) (quoting *Wygant* v. *Jackson Bd. of Ed.,* 476 U. S. 267, 273 (1986) (plurality opinion of Powell, J.)). Our cases establish that, in order to withstand this demanding inquiry, respondents must demonstrate that their methods of using race " 'fit' " a compelling state interest "with greater precision than any alternative means." *Id.,* at 280, n. 6; *Regents of Univ. of Cal.* v. *Bakke,* 438 U. S. 265, 299 (1978) (opinion of Powell, J.) ("When [political judgments] touch upon an individual's race or ethnic background, he is entitled to a judicial determination that the burden he is asked to bear on that basis is precisely tailored to serve a compelling governmental interest").

Before the Court's decision today, we consistently applied the same strict scrutiny analysis regardless of the government's purported reason for using race and regardless of the setting in which race was being used. We rejected calls to use more lenient review in the face of claims that race was being used in "good faith" because " '[m]ore than good motives should be required when government seeks to allocate its resources by way of an explicit racial classification system.' " *Adarand, supra,* at 226; *Fullilove, supra,* at 537 (STEVENS, J., dissenting) ("Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification"). We likewise re-

jected calls to apply more lenient review based on the particular setting in which race is being used. Indeed, even in the specific context of higher education, we emphasized that "constitutional limitations protecting individual rights may not be disregarded." *Bakke, supra,* at 314.

Although the Court recites the language of our strict scrutiny analysis, its application of that review is unprecedented in its deference.

Respondents' asserted justification for the Law School's use of race in the admissions process is "obtaining 'the educational benefits that flow from a diverse student body.'" *Ante,* at 328 (quoting Brief for Respondent Bollinger et al. i). They contend that a "critical mass" of underrepresented minorities is necessary to further that interest. *Ante,* at 330. Respondents and school administrators explain generally that "critical mass" means a sufficient number of underrepresented minority students to achieve several objectives: To ensure that these minority students do not feel isolated or like spokespersons for their race; to provide adequate opportunities for the type of interaction upon which the educational benefits of diversity depend; and to challenge all students to think critically and reexamine stereotypes. See App. to Pet. for Cert. 211a; Brief for Respondent Bollinger et al. 26. These objectives indicate that "critical mass" relates to the size of the student body. *Id.,* at 5 (claiming that the Law School has enrolled "critical mass," or "enough minority students to provide meaningful integration of its classrooms and residence halls"). Respondents further claim that the Law School is achieving "critical mass." *Id.,* at 4 (noting that the Law School's goals have been "greatly furthered by the presence of . . . a 'critical mass' of" minority students in the student body).

In practice, the Law School's program bears little or no relation to its asserted goal of achieving "critical mass." Respondents explain that the Law School seeks to accumulate a "critical mass" of *each* underrepresented minority

group. See, *e. g., id.,* at 49, n. 79 ("The Law School's . . . current policy . . . provide[s] a special commitment to enrolling a 'critical mass' of 'Hispanics'"). But the record demonstrates that the Law School's admissions practices with respect to these groups differ dramatically and cannot be defended under any consistent use of the term "critical mass."

From 1995 through 2000, the Law School admitted between 1,130 and 1,310 students. Of those, between 13 and 19 were Native American, between 91 and 108 were African-American, and between 47 and 56 were Hispanic. If the Law School is admitting between 91 and 108 African-Americans in order to achieve "critical mass," thereby preventing African-American students from feeling "isolated or like spokespersons for their race," one would think that a number of the same order of magnitude would be necessary to accomplish the same purpose for Hispanics and Native Americans. Similarly, even if all of the Native American applicants admitted in a given year matriculate, which the record demonstrates is not at all the case,* how can this possibly constitute a "critical mass" of Native Americans in a class of over 350 students? In order for this pattern of admission to be consistent with the Law School's explanation of "critical mass," one would have to believe that the objectives of "critical mass" offered by respondents are achieved with only half the number of Hispanics and one-sixth the number of Native Americans as compared to African-Americans. But respondents offer no race-specific reasons for such disparities. Instead, they simply emphasize the importance of achieving "critical mass," without any explanation of why that concept is applied differently among the three underrepresented minority groups.

---

*Indeed, during this 5-year time period, enrollment of Native American students dropped to as low as *three* such students. Any assertion that such a small group constituted a "critical mass" of Native Americans is simply absurd.

These different numbers, moreover, come only as a result of substantially different treatment among the three underrepresented minority groups, as is apparent in an example offered by the Law School and highlighted by the Court: The school asserts that it "frequently accepts nonminority applicants with grades and test scores lower than underrepresented minority applicants (and other nonminority applicants) who are rejected." *Ante,* at 338 (citing Brief for Respondent Bollinger et al. 10). Specifically, the Law School states that "[s]ixty-nine minority applicants were rejected between 1995 and 2000 with at least a 3.5 [Grade Point Average (GPA)] and a [score of] 159 or higher on the [Law School Admission Test (LSAT)]" while a number of Caucasian and Asian-American applicants with similar or lower scores were admitted. *Ibid.*

Review of the record reveals only 67 such individuals. Of these 67 individuals, *56* were Hispanic, while only 6 were African-American, and only 5 were Native American. This discrepancy reflects a consistent practice. For example, in 2000, 12 Hispanics who scored between a 159–160 on the LSAT and earned a GPA of 3.00 or higher applied for admission and only 2 were admitted. App. 200–201. Meanwhile, 12 African-Americans in the same range of qualifications applied for admission and all 12 were admitted. *Id.,* at 198. Likewise, that same year, 16 Hispanics who scored between a 151–153 on the LSAT and earned a 3.00 or higher applied for admission and only 1 of those applicants was admitted. *Id.,* at 200–201. Twenty-three similarly qualified African-Americans applied for admission and 14 were admitted. *Id.,* at 198.

These statistics have a significant bearing on petitioner's case. Respondents have *never* offered any race-specific arguments explaining why significantly more individuals from one underrepresented minority group are needed in order to achieve "critical mass" or further student body diversity. They certainly have not explained why Hispanics, who they

have said are among "the groups most isolated by racial barriers in our country," should have their admission capped out in this manner. Brief for Respondent Bollinger et al. 50. True, petitioner is neither Hispanic nor Native American. But the Law School's disparate admissions practices with respect to these minority groups demonstrate that its alleged goal of "critical mass" is simply a sham. Petitioner may use these statistics to expose this sham, which is the basis for the Law School's admission of less qualified underrepresented minorities in preference to her. Surely strict scrutiny cannot permit these sorts of disparities without at least some explanation.

Only when the "critical mass" label is discarded does a likely explanation for these numbers emerge. The Court states that the Law School's goal of attaining a "critical mass" of underrepresented minority students is not an interest in merely "'assur[ing] within its student body some specified percentage of a particular group merely because of its race or ethnic origin.'" *Ante*, at 329 (quoting *Bakke*, 438 U. S., at 307 (opinion of Powell, J.)). The Court recognizes that such an interest "would amount to outright racial balancing, which is patently unconstitutional." *Ante*, at 330. The Court concludes, however, that the Law School's use of race in admissions, consistent with Justice Powell's opinion in *Bakke*, only pays "'[s]ome attention to numbers.'" *Ante*, at 336 (quoting *Bakke, supra*, at 323).

But the correlation between the percentage of the Law School's pool of applicants who are members of the three minority groups and the percentage of the admitted applicants who are members of these same groups is far too precise to be dismissed as merely the result of the school paying "some attention to [the] numbers." As the tables below show, from 1995 through 2000 the percentage of admitted applicants who were members of these minority groups closely tracked the percentage of individuals in the school's applicant pool who were from the same groups.

### Table 1

| Year | Number of law school applicants | Number of African-American applicants | % of applicants who were African-American | Number of applicants admitted by the law school | Number of African-American applicants admitted | % of admitted applicants who were African-American |
|---|---|---|---|---|---|---|
| 1995 | 4147 | 404 | *9.7%* | 1130 | 106 | *9.4%* |
| 1996 | 3677 | 342 | *9.3%* | 1170 | 108 | *9.2%* |
| 1997 | 3429 | 320 | *9.3%* | 1218 | 101 | *8.3%* |
| 1998 | 3537 | 304 | *8.6%* | 1310 | 103 | *7.9%* |
| 1999 | 3400 | 247 | *7.3%* | 1280 | 91 | *7.1%* |
| 2000 | 3432 | 259 | *7.5%* | 1249 | 91 | *7.3%* |

### Table 2

| Year | Number of law school applicants | Number of Hispanic applicants | % of applicants who were Hispanic | Number of applicants admitted by the law school | Number of Hispanic applicants admitted | % of admitted applicants who were Hispanic |
|---|---|---|---|---|---|---|
| 1995 | 4147 | 213 | *5.1%* | 1130 | 56 | *5.0%* |
| 1996 | 3677 | 186 | *5.1%* | 1170 | 54 | *4.6%* |
| 1997 | 3429 | 163 | *4.8%* | 1218 | 47 | *3.9%* |
| 1998 | 3537 | 150 | *4.2%* | 1310 | 55 | *4.2%* |
| 1999 | 3400 | 152 | *4.5%* | 1280 | 48 | *3.8%* |
| 2000 | 3432 | 168 | *4.9%* | 1249 | 53 | *4.2%* |

### Table 3

| Year | Number of law school applicants | Number of Native American applicants | % of applicants who were Native American | Number of applicants admitted by the law school | Number of Native American applicants admitted | % of admitted applicants who were Native American |
|---|---|---|---|---|---|---|
| 1995 | 4147 | 45 | *1.1%* | 1130 | 14 | *1.2%* |
| 1996 | 3677 | 31 | *0.8%* | 1170 | 13 | *1.1%* |
| 1997 | 3429 | 37 | *1.1%* | 1218 | 19 | *1.6%* |
| 1998 | 3537 | 40 | *1.1%* | 1310 | 18 | *1.4%* |
| 1999 | 3400 | 25 | *0.7%* | 1280 | 13 | *1.0%* |
| 2000 | 3432 | 35 | *1.0%* | 1249 | 14 | *1.1%* |

For example, in 1995, when 9.7% of the applicant pool was African-American, 9.4% of the admitted class was African-American. By 2000, only 7.5% of the applicant pool was African-American, and 7.3% of the admitted class was African-American. This correlation is striking. Respondents themselves emphasize that the number of underrepresented minority students admitted to the Law School would be significantly smaller if the race of each applicant were not considered. See App. to Pet. for Cert. 223a; Brief for Respondent Bollinger et al. 6 (quoting App. to Pet. for Cert. 299a). But, as the examples above illustrate, the measure of the decrease would differ dramatically among the groups. The tight correlation between the percentage of applicants and admittees of a given race, therefore, must result from careful race based planning by the Law School. It suggests a formula for admission based on the aspirational assumption that all applicants are equally qualified academically, and therefore that the proportion of each group admitted should be the same as the proportion of that group in the applicant pool. See Brief for Respondent Bollinger et al. 43, n. 70 (discussing admissions officers' use of "periodic reports" to track "the racial composition of the developing class").

Not only do respondents fail to explain this phenomenon, they attempt to obscure it. See id., at 32, n. 50 ("The Law School's minority enrollment percentages . . . diverged from the percentages in the applicant pool by as much as 17.7% from 1995–2000"). But the divergence between the percentages of underrepresented minorities in the applicant pool and in the *enrolled* classes is not the only relevant comparison. In fact, it may not be the most relevant comparison. The Law School cannot precisely control which of its admitted applicants decide to attend the university. But it can and, as the numbers demonstrate, clearly does employ racial preferences in extending offers of admission. Indeed, the ostensibly flexible nature of the Law School's admissions program

that the Court finds appealing, see *ante,* at 337–338, appears to be, in practice, a carefully managed program designed to ensure proportionate representation of applicants from selected minority groups.

I do not believe that the Constitution gives the Law School such free rein in the use of race. The Law School has offered no explanation for its actual admissions practices and, unexplained, we are bound to conclude that the Law School has managed its admissions program, not to achieve a "critical mass," but to extend offers of admission to members of selected minority groups in proportion to their statistical representation in the applicant pool. But this is precisely the type of racial balancing that the Court itself calls "patently unconstitutional." *Ante,* at 330.

Finally, I believe that the Law School's program fails strict scrutiny because it is devoid of any reasonably precise time limit on the Law School's use of race in admissions. We have emphasized that we will consider "the planned duration of the remedy" in determining whether a race-conscious program is constitutional. *Fullilove,* 448 U. S., at 510 (Powell, J., concurring); see also *United States* v. *Paradise,* 480 U. S. 149, 171 (1987) ("In determining whether race-conscious remedies are appropriate, we look to several factors, including the . . . duration of the relief"). Our previous cases have required some limit on the duration of programs such as this because discrimination on the basis of race is invidious.

The Court suggests a possible 25-year limitation on the Law School's current program. See *ante,* at 343. Respondents, on the other hand, remain more ambiguous, explaining that "[t]he Law School of course recognizes that race-conscious programs must have reasonable durational limits, and the Sixth Circuit properly found such a limit in the Law School's resolve to cease considering race when genuine race-neutral alternatives become available." Brief for Respondent Bollinger et al. 32. These discussions of a time

limit are the vaguest of assurances. In truth, they permit the Law School's use of racial preferences on a seemingly permanent basis. Thus, an important component of strict scrutiny—that a program be limited in time—is casually subverted.

The Court, in an unprecedented display of deference under our strict scrutiny analysis, upholds the Law School's program despite its obvious flaws. We have said that when it comes to the use of race, the connection between the ends and the means used to attain them must be precise. But here the flaw is deeper than that; it is not merely a question of "fit" between ends and means. Here the means actually used are forbidden by the Equal Protection Clause of the Constitution.

JUSTICE KENNEDY, dissenting.

The separate opinion by Justice Powell in *Regents of Univ. of Cal.* v. *Bakke*, 438 U. S. 265, 289–291, 315–318 (1978), is based on the principle that a university admissions program may take account of race as one, nonpredominant factor in a system designed to consider each applicant as an individual, provided the program can meet the test of strict scrutiny by the judiciary. This is a unitary formulation. If strict scrutiny is abandoned or manipulated to distort its real and accepted meaning, the Court lacks authority to approve the use of race even in this modest, limited way. The opinion by Justice Powell, in my view, states the correct rule for resolving this case. The Court, however, does not apply strict scrutiny. By trying to say otherwise, it undermines both the test and its own controlling precedents.

Justice Powell's approval of the use of race in university admissions reflected a tradition, grounded in the First Amendment, of acknowledging a university's conception of its educational mission. *Id.,* at 312–314; *ante,* at 329. Our precedents provide a basis for the Court's acceptance of a university's considered judgment that racial diversity among

students can further its educational task, when supported by empirical evidence. *Ante,* at 329–331.

It is unfortunate, however, that the Court takes the first part of Justice Powell's rule but abandons the second. Having approved the use of race as a factor in the admissions process, the majority proceeds to nullify the essential safeguard Justice Powell insisted upon as the precondition of the approval. The safeguard was rigorous judicial review, with strict scrutiny as the controlling standard. *Bakke, supra,* at 291 ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination"). This Court has reaffirmed, subsequent to *Bakke,* the absolute necessity of strict scrutiny when the State uses race as an operative category. *Adarand Constructors, Inc.* v. *Peña,* 515 U. S. 200, 224 (1995) ("[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny"); *Richmond* v. *J. A. Croson Co.,* 488 U. S. 469, 493–494 (1989); see *id.,* at 519 (KENNEDY, J., concurring in part and concurring in judgment) ("[A]ny racial preference must face the most rigorous scrutiny by the courts"). The Court confuses deference to a university's definition of its educational objective with deference to the implementation of this goal. In the context of university admissions the objective of racial diversity can be accepted based on empirical data known to us, but deference is not to be given with respect to the methods by which it is pursued. Preferment by race, when resorted to by the State, can be the most divisive of all policies, containing within it the potential to destroy confidence in the Constitution and in the idea of equality. The majority today refuses to be faithful to the settled principle of strict review designed to reflect these concerns.

The Court, in a review that is nothing short of perfunctory, accepts the University of Michigan Law School's (Law

School) assurances that its admissions process meets with constitutional requirements. The majority fails to confront the reality of how the Law School's admissions policy is implemented. The dissenting opinion by THE CHIEF JUSTICE, which I join in full, demonstrates beyond question why the concept of critical mass is a delusion used by the Law School to mask its attempt to make race an automatic factor in most instances and to achieve numerical goals indistinguishable from quotas. An effort to achieve racial balance among the minorities the school seeks to attract is, by the Court's own admission, "patently unconstitutional." *Ante*, at 330; see also *Bakke, supra*, at 307 (opinion of Powell, J.). It remains to point out how critical mass becomes inconsistent with individual consideration in some more specific aspects of the admissions process.

About 80% to 85% of the places in the entering class are given to applicants in the upper range of Law School Admissions Test scores and grades. An applicant with these credentials likely will be admitted without consideration of race or ethnicity. With respect to the remaining 15% to 20% of the seats, race is likely outcome determinative for many members of minority groups. That is where the competition becomes tight and where any given applicant's chance of admission is far smaller if he or she lacks minority status. At this point the numerical concept of critical mass has the real potential to compromise individual review.

The Law School has not demonstrated how individual consideration is, or can be, preserved at this stage of the application process given the instruction to attain what it calls critical mass. In fact the evidence shows otherwise. There was little deviation among admitted minority students during the years from 1995 to 1998. The percentage of enrolled minorities fluctuated only by 0.3%, from 13.5% to 13.8%. The number of minority students to whom offers were extended varied by just a slightly greater magnitude of 2.2%, from the high of 15.6% in 1995 to the low of 13.4% in 1998.

The District Court relied on this uncontested fact to draw an inference that the Law School's pursuit of critical mass mutated into the equivalent of a quota. 137 F. Supp. 2d 821, 851 (ED Mich. 2001). Admittedly, there were greater fluctuations among enrolled minorities in the preceding years, 1987–1994, by as much as 5% or 6%. The percentage of minority offers, however, at no point fell below 12%, historically defined by the Law School as the bottom of its critical mass range. The greater variance during the earlier years, in any event, does not dispel suspicion that the school engaged in racial balancing. The data would be consistent with an inference that the Law School modified its target only twice, in 1991 (from 13% to 19%), and then again in 1995 (back from 20% to 13%). The intervening year, 1993, when the percentage dropped to 14.5%, could be an aberration, caused by the school's miscalculation as to how many applicants with offers would accept or by its redefinition, made in April 1992, of which minority groups were entitled to race-based preference. See Brief for Respondent Bollinger et al. 49, n. 79.

| Year | Percentage of enrolled minority students |
|------|------------------------------------------|
| 1987 | 12.3% |
| 1988 | 13.6% |
| 1989 | 14.4% |
| 1990 | 13.4% |
| 1991 | 19.1% |
| 1992 | 19.8% |
| 1993 | 14.5% |
| 1994 | 20.1% |
| 1995 | 13.5% |
| 1996 | 13.8% |
| 1997 | 13.6% |
| 1998 | 13.8% |

The narrow fluctuation band raises an inference that the Law School subverted individual determination, and strict

scrutiny requires the Law School to overcome the inference. Whether the objective of critical mass "is described as a quota or a goal, it is a line drawn on the basis of race and ethnic status," and so risks compromising individual assessment. *Bakke*, 438 U. S., at 289 (opinion of Powell, J.). In this respect the Law School program compares unfavorably with the experience of Little Ivy League colleges. *Amicus* Amherst College, for example, informs us that the offers it extended to students of African-American background during the period from 1993 to 2002 ranged between 81 and 125 out of 950 offers total, resulting in a fluctuation from 24 to 49 matriculated students in a class of about 425. See Brief for Amherst College et al. as *Amici Curiae* 10–11. The Law School insisted upon a much smaller fluctuation, both in the offers extended and in the students who eventually enrolled, despite having a comparable class size.

The Law School has the burden of proving, in conformance with the standard of strict scrutiny, that it did not utilize race in an unconstitutional way. *Adarand Constructors*, 515 U. S., at 224. At the very least, the constancy of admitted minority students and the close correlation between the racial breakdown of admitted minorities and the composition of the applicant pool, discussed by THE CHIEF JUSTICE, *ante*, at 380–386, require the Law School either to produce a convincing explanation or to show it has taken adequate steps to ensure individual assessment. The Law School does neither.

The obvious tension between the pursuit of critical mass and the requirement of individual review increased by the end of the admissions season. Most of the decisions where race may decide the outcome are made during this period. See *supra*, at 389. The admissions officers consulted the daily reports which indicated the composition of the incoming class along racial lines. As Dennis Shields, Director of Admissions from 1991 to 1996, stated, "the further [he] went into the [admissions] season the more frequently [he] would

want to look at these [reports] and see the change from day-to-day." These reports would "track exactly where [the Law School] st[ood] at any given time in assembling the class," and so would tell the admissions personnel whether they were short of assembling a critical mass of minority students. Shields generated these reports because the Law School's admissions policy told him the racial makeup of the entering class was "something [he] need[ed] to be concerned about," and so he had "to find a way of tracking what's going on." Deposition of Dennis Shields in Civ. Action No. 97–75928, pp. 129–130, 141 (ED Mich., Dec. 7, 1998).

The consultation of daily reports during the last stages in the admissions process suggests there was no further attempt at individual review save for race itself. The admissions officers could use the reports to recalibrate the plus factor given to race depending on how close they were to achieving the Law School's goal of critical mass. The bonus factor of race would then become divorced from individual review; it would be premised instead on the numerical objective set by the Law School.

The Law School made no effort to guard against this danger. It provided no guidelines to its admissions personnel on how to reconcile individual assessment with the directive to admit a critical mass of minority students. The admissions program could have been structured to eliminate at least some of the risk that the promise of individual evaluation was not being kept. The daily consideration of racial breakdown of admitted students is not a feature of affirmative-action programs used by other institutions of higher learning. The Little Ivy League colleges, for instance, do not keep ongoing tallies of racial or ethnic composition of their entering students. See Brief for Amherst College et al. as *Amici Curiae* 10.

To be constitutional, a university's compelling interest in a diverse student body must be achieved by a system where individual assessment is safeguarded through the entire process. There is no constitutional objection to the goal of

considering race as one modest factor among many others to achieve diversity, but an educational institution must ensure, through sufficient procedures, that each applicant receives individual consideration and that race does not become a predominant factor in the admissions decisionmaking. The Law School failed to comply with this requirement, and by no means has it carried its burden to show otherwise by the test of strict scrutiny.

The Court's refusal to apply meaningful strict scrutiny will lead to serious consequences. By deferring to the law schools' choice of minority admissions programs, the courts will lose the talents and resources of the faculties and administrators in devising new and fairer ways to ensure individual consideration. Constant and rigorous judicial review forces the law school faculties to undertake their responsibilities as state employees in this most sensitive of areas with utmost fidelity to the mandate of the Constitution. Dean Allan Stillwagon, who directed the Law School's Office of Admissions from 1979 to 1990, explained the difficulties he encountered in defining racial groups entitled to benefit under the Law School's affirmative action policy. He testified that faculty members were "breathtakingly cynical" in deciding who would qualify as a member of underrepresented minorities. An example he offered was faculty debate as to whether Cubans should be counted as Hispanics: One professor objected on the grounds that Cubans were Republicans. Many academics at other law schools who are "affirmative action's more forthright defenders readily concede that diversity is merely the current rationale of convenience for a policy that they prefer to justify on other grounds." Schuck, Affirmative Action: Past, Present, and Future, 20 Yale L. & Pol'y Rev. 1, 34 (2002) (citing Levinson, Diversity, 2 U. Pa. J. Const. L. 573, 577–578 (2000); Rubenfeld, Affirmative Action, 107 Yale L. J. 427, 471 (1997)). This is not to suggest the faculty at Michigan or other law schools do not pursue aspirations they consider laudable and consistent with our constitutional

traditions. It is but further evidence of the necessity for scrutiny that is real, not feigned, where the corrosive category of race is a factor in decisionmaking. Prospective students, the courts, and the public can demand that the State and its law schools prove their process is fair and constitutional in every phase of implementation.

It is difficult to assess the Court's pronouncement that race-conscious admissions programs will be unnecessary 25 years from now. *Ante,* at 341–343. If it is intended to mitigate the damage the Court does to the concept of strict scrutiny, neither petitioner nor other rejected law school applicants will find solace in knowing the basic protection put in place by Justice Powell will be suspended for a full quarter of a century. Deference is antithetical to strict scrutiny, not consistent with it.

As to the interpretation that the opinion contains its own self-destruct mechanism, the majority's abandonment of strict scrutiny undermines this objective. Were the courts to apply a searching standard to race-based admissions schemes, that would force educational institutions to seriously explore race-neutral alternatives. The Court, by contrast, is willing to be satisfied by the Law School's profession of its own good faith. The majority admits as much: "We take the Law School at its word that it would 'like nothing better than to find a race-neutral admissions formula' and will terminate its race-conscious admissions program as soon as practicable." *Ante,* at 343 (quoting Brief for Respondent Bollinger et al. 34).

If universities are given the latitude to administer programs that are tantamount to quotas, they will have few incentives to make the existing minority admissions schemes transparent and protective of individual review. The unhappy consequence will be to perpetuate the hostilities that proper consideration of race is designed to avoid. The perpetuation, of course, would be the worst of all outcomes. Other programs do exist which will be more effective in

bringing about the harmony and mutual respect among all citizens that our constitutional tradition has always sought. They, and not the program under review here, should be the model, even if the Court defaults by not demanding it.

It is regrettable the Court's important holding allowing racial minorities to have their special circumstances considered in order to improve their educational opportunities is accompanied by a suspension of the strict scrutiny which was the predicate of allowing race to be considered in the first place. If the Court abdicates its constitutional duty to give strict scrutiny to the use of race in university admissions, it negates my authority to approve the use of race in pursuit of student diversity. The Constitution cannot confer the right to classify on the basis of race even in this special context absent searching judicial review. For these reasons, though I reiterate my approval of giving appropriate consideration to race in this one context, I must dissent in the present case.